In the Matter of MITCHELL C., an Infant, by His Parent and Natural Guardian, et al., Appellants, v BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK et al., Respondents.

Second Department, April 9, 1979

## APPEARANCES OF COUNSEL

*Rebell & Krieger* (*Dennis C. Krieger* of counsel), for appellants.

*W. Bernard Richland*, Corporation Counsel (*Carolyn E. Demarest* and *Leonard Koerner* of counsel), for respondents.

## OPINION OF THE COURT

TITONE, J.

This is a proceeding pursuant to CPLR article 78 to review and annul the determination of the respondent Board of Education altering the hours of school bus transportation for the three individual petitioners to and from the petitioner schools, The Summit School (Summit) and The Horizon School (Horizon). The individual petitioners brought the proceeding on behalf of themselves and all similarly situated handicapped children attending the institutions of the petitioner schools. Special Term dismissed the petition.

The primary issues presented are (1) whether the respon-

dents, namely the Board of Education of New York City, its Chancellor and its Director of Transportation, Bureau of Pupil Transportation, were providing under their revised transportation plan, suitable transportation and educational facilities to the handicapped children herein and (2) whether the determination to change the bus schedules for the petitioner schools and their handicapped students was arbitrary, capricious and discriminatory.

With respect to the second issue, this court, by order dated January 3, 1978, remitted the proceeding to Special Term to hear and report on whether the determination of the respondent board that the petitioner private schools were not entitled to an exemption from the revision of the bus transportation schedule for the 1977-1978 school year was arbitrary, in light of the allegation that the board had granted exemptions to 14 other private schools. This appeal was held in abeyance in the interim (60 AD2d 841). Special Term has conducted a hearing and submitted its report.

The uncontroverted facts gleaned from the petition, answer and relevant exhibits submitted with such pleadings are as follows:

Prior to the 1977-1978 school year, the hours of instruction at the petitioner schools were 8:30 A.M. to 2:30 P.M. for Summit, and 9:00 A.M. to 2:00 P.M. for Horizon. During those prior years, respondents provided transportation to and from each school which coincided with each one's hours of instruction.

However, on June 9, 1977, Joseph A. Kratovil, Executive Director of the Division of Business and Administration of the respondent Board of Education, promulgated a memorandum entitled "Transportation for pupils attending private schools for the 1977-78 school year". It was sent to all private schools which had contracted to assist in meeting the educational needs of children in the New York City school system, including the petitioner schools. Kratovil requested that class sessions be scheduled during the 1977-1978 school year from 10:00 A.M. to 4:00 P.M., rather than from 9:00 A.M. to 3:00 P.M. The purpose of such rescheduling was, according to the memorandum, to "allow the Board of Education to utilize the same vehicles to serve your school that are being used to serve the public schools on their regular session." The Board of Education took the position that it could save more than three million dollars by staggering school sessions, and thus bridge a

projected budget gap for the then upcoming school year. In their answer respondents alleged that this "double utilization program" for school buses was instituted during the 1976-1977 school year in three community school districts, and both handicapped and nonhandicapped students were involved. Thus, in the spring of 1977, respondents "determined to extend this successful economy measure to include private schools as well as public schools."

The petitioner schools advised respondents that they were unable to comply with the proposed changes in class schedules. Summit protested that (1) the new schedule would work a hardship on working parents since they would have to alter their schedules to supervise their children for an additional hour in the morning, (2) children requiring special education are more receptive to learning during the early morning hours, (3) teachers would not be able to participate in necessary graduate courses if daily school sessions concluded at 4:00 P.M. and (4) buses leaving the school at that hour would be involved in increased traffic. Horizon likewise cited the productivity of its students in the morning hours and the inconvenience to working parents, and also asserted that its landlord required it to vacate the classrooms shortly after 2:00 P.M.

Because it would be physically impossible to implement schedule changes in all cases, and also unnecessary in order to attain the required savings, respondents decided to grant some but not all of the private schools exemptions from the proposed rescheduling of bus transportation. According to respondents' answer, the following factors were taken into account in determining whether a school requesting an exemption from the new schedule should be accommodated:

(a) exemptions were not granted to schools drawing most of their students from one borough;

(b) exemptions were not granted to private schools which were easily scheduled with public schools using the same vehicles earlier in the day; and

(c) exemptions were not granted to private schools which would not be severely affected by a scheduling change.

Thereafter respondents denied each petitioner school's request for an exemption. Eight private schools including Summit and Horizon were placed under the new bus schedules for the 1977-1978 school year. Both schools allege that at least 14 private schools had been granted exemptions.

In the instant CPLR article 78 proceeding, petitioners reiterated and expanded upon their arguments about the adverse effects the new bus schedules would have on the working parents of handicapped children, the learning capacity of the children, the ability of their teachers to participate in necessary graduate work, etc. They contend that by adopting the "double utilization program" of bus transportation, respondents (1) breached the terms of a contract between the parties, (2) failed to provide appropriate or suitable services for handicapped children in petitioners' schools in derogation of subdivision 2 of section 4401 and section 4402 (subd 2, pars a, b, cl [1]) of the Education Law and (3) made a determination which is arbitrary and capricious since under the proposed revised bus schedule the children at the petitioner schools are not provided equal transportation schedules. According to the petitioner schools, handicapped children attending their institutions are not, *inter alia,* provided transportation services equal either to their counterparts attending other private schools which have received exemptions from the proposed revised schedules, or to the vast majority of children in New York City attending school on a normal schedule. In my opinion the judgment of Special Term should be affirmed.

■ Concededly, although the right to an education is not guaranteed by the United States Constitution *(San Antonio School Dist. v Rodriguez,* 411 US 1), where a State or subdivision thereof undertakes to provide a free education to all students, it must recognize an individual student's legitimate entitlement to a public education as a property interest protected by the due process clause *(Goss v Lopez,* 419 US 565, 574), and it may not discriminate against handicapped children (cf. *Reid v Board of Educ.,* 453 F2d 238). Moreover, the State's interest in educating handicapped children clearly outweighs its interest in preserving its financial interests.

Thus, consistent with the afore-mentioned due process requirements, in order to insure that handicapped children will have an equal opportunity to obtain an education, the Legislature has mandated that a board of education or the trustees of a school district provide suitable transportation to and from private schools having classes or programs for such children designed to serve their special needs (Education Law, § 4401, subds 2, 4; § 4402, subd 4, par a).

However, in allocating funds available to run an educational system, which includes transportation of some of its

students, an agency such as the respondent board has the right to use such funds in the most economical manner it believes possible provided all children, handicapped and non-handicapped, are treated alike according to an objective standard of practicality and need. In this instance it seems clear that the change sought to be made in the school transportation schedule was necessitated by the insufficiency of funds available to continue under the old system. According to the afore-mentioned memorandum promulgated by the executive director of the board's Division of Business and Administration to *all* private schools on June 9, 1977, the plan for the double utilization of school buses for the 1977-1978 school year, which included staggering of school sessions in the private sector, could save more than three million dollars.

It is also undisputed that for the 1976-1977 school year transportation schedules for public school children, handicapped and nonhandicapped alike, were similarly revised for budgetary savings in three community school districts. Thus, contrary to petitioners' contentions, the adjustments in dispute were not instituted solely to affect private schools, but rather to extend such economy measure to include private as well as public schools. If sufficient funds are not available to finance all of the services and programs needed and desirable in a school system, then available funds must be expended equitably in such a manner that no child is entirely excluded from a publicly supported education consistent with his needs and ability to benefit therefrom (*Mills v Board of Educ.,* 348 F Supp 866, 876).

In this situation the weighing of competing factors in the proposed rescheduling of bus transportation, i.e., the alleged resulting problems and inconvenience for certain working parents and teachers involved in graduate studies, the purported adverse effect on the learning productivity caused by the loss of class time between 8:30 A.M. and 10:00 A.M., etc., as opposed to the alleged need to adjust school hours of certain schools in order to economize bus transportation costs with a minimal impact on the over-all educational curricula, is an administrative responsibility solely within the purview of the respondent board in the first instance. The courts should not assume the exercise of educational policy vested by constitution and statute in school administrative agencies so long as such agencies do not violate defined public policies (see *James v Board of Educ.* 42 NY2d 357, 366-367).

In this regard I believe the criteria evolved by the respondent board to be applied as guidelines in determining which private schools should be granted exemptions from the 1977-1978 bus schedules were, as succinctly stated by Special Term, "fair, reasonable, objective, and obviously drawn for the sole purpose of making the practical implementation of the proposed change possible, and in no way to serve the purpose of discrimination."

■ However, with respect to the implementation of such criteria, the petitioners did raise a question of fact which required the hearing before Special Term (mandated by this court), as to the objectivity of the board in granting exemptions from the revised bus schedules to some of the schools and denying them, *inter alia,* to the petitioner schools. Although responsibility to resolve questions of judgment, discretion, allocations of resources and priorities is vested in educational officials at both the local and State levels, an issue as to the arbitrariness of administrative determinations of such questions is a matter for judicial review *(Matter of Board of Educ. v Graves,* 175 Misc 205, affd 261 App Div 1115).

### HEARING ON REMITTITUR

At the hearing before Special Term on the allegations of the petitioner schools that exemptions from the new bus schedules were denied them arbitrarily in view of the fact that at least 14 other private schools for handicapped children were granted exemptions, the following pertinent evidence was adduced:

In the spring of 1977, the Board of Education estimated that although the moneys allocated to the school system for the forthcoming fiscal year, 1977-1978, were to remain the same as the fiscal year 1976-1977, to wit, 65.5 million dollars, projections indicated that an additional 2.2 million dollars would be needed in 1977-1978 for public transportation of students. In order to eliminate such anticipated budget deficit or gap so as not to be subjected to criminal penalties (New York State Financial Emergency Act for the City of New York, § 11, subd 3 [L 1975, ch 868, § 2]) the responsible officials of the Board of Education held meetings on the problem. Testimony was also adduced that in the prior school year, 1976-1977, the board had eliminated 18 million dollars of privileges from nonhandicapped students primarily in the public sector. It was felt that in all fairness further savings

should not come from the nonhandicapped students, but, rather, from another group.

To effectuate the saving of the 2.2 million dollars needed to bridge the projected budget gap for the 1977-1978 school year, and at the same time keep the impact on the quality of education to a minimum and continue transportation privileges, the board decided to place private schools on "off sessions" in order to accomplish the "double utilization" of available bus transportation. Off-session scheduling was not a new policy, and had been used prior to 1977. Some of the 71 private schools for the handicapped to whom the memorandum of June 9, 1977 had been sent, were already on such a schedule.

However, it was not necessary to institute "off sessions" for all of the schools, and as a result there were some that could have been placed on it but were not. The object was to obtain the greatest "cost effectiveness" with the least disruption. Thus, schools which were in close proximity to one another and which drew most of their children from the same borough, were paired in order to keep the children's traveling distance to a minimum. The board also considered the degree of the children's handicaps.

With respect to the petitioner schools, testimony was adduced from Richard Bautz, Purchase Director of the board's Bureau of Transportation, who scheduled bus runs for emotionally handicapped children in private schools in Queens, that of the 109 pupils attending Horizon, 90 were from Queens, 11 from Brooklyn, 7 from The Bronx and 1 from Manhattan. Figures obtained for petitioner Summit (before it eventually went on a 7:30 A.M. to 1:30 P.M. schedule) revealed that it had 116 students from Queens, 19 from Brooklyn, 11 from The Bronx, 4 from Manhattan and 1 from Staten Island. According to Bautz, of the 21 schools on which he did a head count, Summit had the largest number of students residing in Queens, and Horizon (both of its schools) had the second largest number. He also testified that of the number of private schools for emotionally disturbed or handicapped children whose enrollments came under his analysis, Summit and Horizon were the only schools where the board was not getting second use out of the buses.

Based on the foregoing summarization and other voluminous evidence adduced at the hearing on the remand, I believe the respondent board, through the responsible officers in-

volved, exercised its discretion in this instance in a fair and reasonable manner. It clearly appears from the record that much thought, evaluation and consideration went into what undoubtedly was a difficult, vexing and emotional problem. No evidence was adduced that the petitioner schools were arbitrarily selected for the double utilization program. To the contrary, it is evident that a thorough screening was conducted before it was determined that on a cost-effectiveness basis, and with the minimum disruption possible, the Summit and Horizon Schools should be included in the program in order to help bridge the 2.2 million dollar transportation budget gap. The fact that other schools also could have been legitimately placed in the program does not demonstrate that Horizon and Summit were the victims of discrimination but, rather, demonstrates that respondents made every effort to minimize its impact. In any event, administration by an official of a State statute or administrative rule, fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present an element of intentional or purposeful discrimination; and one must prove more than mere nonenforcement against others in a similar situation (see *Matter of Di Maggio v Brown,* 19 NY2d 283, 289-290). Petitioners herein have neither alleged nor demonstrated that respondents' selection of Summit and Horizon for the double utilization program rather than other schools which might also have been selected (or selected in their place) was the result of a clear and intentional or invidious discrimination (see *Matter of Di Maggio v Brown, supra,* pp 291-292).

Accordingly, the judgment of Special Term should be affirmed insofar as appealed from.

MOLLEN, P. J., SUOZZI and RABIN, JJ., concur.

Judgment affirmed insofar as appealed from, without costs or disbursements.