**Zakunda–Ze HANDBERRY, et al., Plaintiffs,**

v.

**William C. THOMPSON, Jr., et al., Defendants.**

**No. 96 CIV. 6161.**

United States District Court, S.D. New York.

Aug. 28, 2002.

Dori A. Lewis, Mary Lynne Werlwas, Prisoners' Rights Project, Legal Aid Society, Brooklyn, NY, for plaintiffs.

Janice L. Birnbaum, Office of Michael A. Cardozo, Corporation Counsel of the City of New York, New York City, for City defendants.

Judith T. Kramer, Office of Eliot Spitzer, Attorney General of the State of New York, New York City, for State defendant.

## OPINION

MOTLEY, District Judge.

## OPINION ON THE PARTIES' CROSS-APPLICATIONS TO AMEND THE EDUCATION PLAN

### I. Introduction

Reformation, like education, is a journey, not a destination.

Mary Belle Harris, *I Knew Them in Prison* (1936) [1]

Almost exactly six years ago, plaintiffs brought this class action suit against defendants the City of New York, the Board of Education of the City of New York ("BOE"), the New York City Department of Correction ("DOC"), and various city officials (collectively the "City defendants"). Also named as a defendant was the Commissioner of the New York State Education Department. The plaintiff class consists of inmates incarcerated at DOC facilities on Rikers Island who are sixteen to twenty-one years of age and have yet to receive a high school diploma or its equivalent. Plaintiffs allege that defendants have failed to provide them with educational services to which they are entitled under federal and state law.

In January 2000 this court granted plaintiffs' motion for declaratory and partial summary judgment against the City defendants, finding that the City defendants had violated the constitutional and statutory rights of plaintiffs. The court

ordered the City defendants to submit for the court's approval a remedial plan "for providing full and complete educational facilities and services to all eligible Rikers Island inmates." Order, Jan. 7, 2000, ¶ 12. In April 2000 the City defendants submitted their "Education Plan for the Rikers Island Academies" ("Education Plan" or "Plan"). The court only reluctantly approved the Plan, noting that the Plan would "not meet all the needs of incarcerated youth inmates" and that it was "deficient in many respects." Order, June 29, 2000, ¶ 2. The court therefore simultaneously appointed a monitor to observe the Education Plan in action for a period of one year. *See id.* ¶¶ 3–4. After the one-year period of observation, the monitor was to file a report with the court and make recommendations for improvements to the Plan. *See id.*

The court-appointed monitor, Dr. Sheri Meisel (the "monitor"), filed her Final Report with the court in December 2001, and in response the parties submitted proposed modifications to the Education Plan. The Final Report and the parties' submissions make clear that the City defendants continue to fail to meet their obligations under state and federal law. Indeed, the City defendants appear to concede that modification to the Education Plan is necessary; they have submitted a four-page "Corrective Action Plan" for the court's approval which, they assert, will address any remaining shortcomings.

Plaintiffs object to the City defendants' Corrective Action Plan as woefully inadequate. Plaintiffs argue that defendants

---

1. Mary Belle Harris, the first woman to head a federal prison, recognized the importance and utility of educating prisoners over seventy-five years ago. *See* Joseph W. Rogers, *Mary Bell Harris: Warden and Rehabilitation Pioneer,* Women & Crim.Just., Vol. 11, No. 4, at 5 (2000); Esther Heffernan, *The Alderson Years,* Fed. Prisons J., Vol. 3, No. 1, at 21 (Spring

1992). Recent studies have confirmed what Ms. Harris believed long ago—that inmates who receive schooling while in prison are less likely to return there after release. *See* Tamar Lewin, *Inmate Education Is Found to Lower Risk of New Arrest,* N.Y. Times, Nov. 16, 2001, at A22.

have had their opportunity to remedy the situation and have failed. Plaintiffs therefore argue for substantial court intervention and supervision over the provision of educational services to plaintiffs. Plaintiffs have submitted a highly detailed, thirty-seven page Proposed Order which, to be blunt, approaches a policies and procedures manual in its depth and detail. Plaintiffs claim that such intrusiveness is necessary to ensure that the classmembers' rights are vindicated.

On April 12, 2002, the court heard the parties on their proposed modifications to the Education Plan, and the court permitted defendants to file post-argument replies. For the reasons stated in this opinion, the court will order several modifications to the original Education Plan. The court, however, is not inclined to engage in the sort of micromanaging that plaintiffs have proposed.

Finally, the court would be remiss if it failed to note that significant improvements have been made at Rikers Island over the past six years with regard to the educational services provided to classmembers. See Final Rep. at 8–9; Lisante Decl. ¶ 5; Conry Decl. ¶ 6. The court is pleased with the progress that has been made, and the court is confident that the City defendants—with a sensible degree of judicial nudging—can come into full compliance with the law. The Education Plan will be modified accordingly.

## II. The Declaratory Judgment

■ As an initial matter, the court would like to correct a misapprehension that the City defendants have. The City defendants insist that this court's entry of a declaratory judgment against them was only "based on plaintiffs' procedural due process claim[s]," and that the court "made no rulings on plaintiffs' IDEA, Rehabilitation Act, Americans with Disabilities Act, and state law claims." City Defs.' Resp. at 2. The City defendants are mistaken.

First, the court reminds the City defendants that the court granted plaintiffs' motion for declaratory judgment at the close of oral argument, reading out a handwritten order which stated "the motion for a declaratory judgment by plaintiff[s] in [their] favor is granted." Order, Jan. 7, 2000, ¶ 12. There were no restrictions placed on that grant. As plaintiffs' moving papers make clear, their motion for declaratory judgment was premised on the New York Constitution, New York Education Law, New York State Education and Executive Department regulations, the Individuals with Disabilities in Education Act ("IDEA") and implementing regulations, the Rehabilitation Act and implementing regulations, the Americans with Disabilities Act ("ADA") and implementing regulations, 42 U.S.C. § 1983, and the United States Constitution. See Mem.Supp. Pls.' Mot. Declaratory J. & Partial Summ.J. Against City Defs. at 5–25.

Second, the court's subsequent opinion served primarily to reject the City defendants' purported "defenses" (mootness, abstention, and failure to exhaust administrative remedies) and to explain the rationale for the court's denial of the City defendants' cross-motion for summary judgment—a motion upon which the court had yet to rule. See Handberry v. Thompson, 92 F.Supp.2d 244, 247–48 (S.D.N.Y.2000). Since the court had already granted plaintiffs' motion for declaratory judgment from the bench, the court, in the interest of efficiency, kept the remainder of the opinion rather brief—the entire opinion consumes only five pages of the Federal Supplement 2d. The court did not survey the volumes of evidence presented that supported plaintiffs' claims, nor did the court survey all the relevant law upon which it

relied when it had granted the motion two months earlier.

The court also reminds the City defendants that the court found that their original Education Plan did not "meet all of the needs of incarcerated youth inmates on Rikers Island and [was] deficient in many respects as disclosed by plaintiffs' proposed plan." Order, June 29, 2000, ¶ 2. If the court had, in fact, relied only upon plaintiffs' due process claims in evaluating the Plan, the court would not have found the Education Plan to be so inadequate.

Finally, to think that the court would only rule on plaintiffs' constitutional claims and no others strains credulity. The court would not have simply held the remaining claims in abeyance for two years without ruling on them, nor does the court believe that plaintiffs' zealous counsel would have sat by idly if everyone did not know that the court had, in fact, ruled on plaintiffs' statutory and regulatory claims as well as their constitutional ones. The City defendants' contention that their liability was premised only on plaintiffs' procedural due process claims is therefore without merit.

### III. The Final Report of the Monitor

The court-appointed monitor, Dr. Sheri Meisel, issued her Final Report on December 5, 2001. In her Report, she details her observations regarding the provision of educational services at Rikers Island. The monitor based her findings upon numerous site visits over the course of the year, interviews with inmates, consultations with BOE and DOC employees and administrators, and an examination of BOE and DOC documents as well as submissions of the parties. Dr. Meisel, a non-lawyer, also makes some legal conclusions and recommendations concerning modification of the Educational Plan.

In their papers filed in response to the Final Report, plaintiffs have urged the court to simply adopt the Final Report's factual findings as findings of the court. *See* Pls.' Resp. at 5–6. At oral argument, however, plaintiffs retreated from that position: "We just wanted to make clear that our suggestion was simply, with respect, that the court adopt the uncontroverted findings ... [W]e were only asking that the court adopt those findings that are not in dispute." Oral Arg.Tr. 04/12/02 at 71.

The City defendants, in response to the Final Report, have submitted declarations from Steven Conry (DOC Bureau Chief of Management and Planning), Marjorie Weiner (a DOC research scientist), and Timothy Lisante (BOE Deputy Superintendent for Alternative, Adult and Continuing Education, Schools and Programs). These declarations contradict or clarify several findings of the monitor.

The court declines plaintiffs' initial invitation to a wholesale adoption of the Final Report. Rather, the court will adopt only specific *factual* findings contained in the Report, and *only* those findings which have been uncontroverted by the City defendants' submissions. The court will disregard the monitor's legal conclusions. Finally, while the court greatly appreciates the monitor's recommendations for improvement, for reasons explained below, it cannot adopt many of them.

The court will not separately summarize or survey the facts contained in the Final Report or those contained in the City defendants' declarations submitted in opposition. This opinion will assume the reader's familiarity with those documents as well as the history of this case. Each issue addressed below will reference relevant portions of the record. Any factual findings of the court will be limited at this time to those that are made herein.

### IV. The Nature of Relief

■ The Prison Litigation Reform Act, 18 U.S.C. § 3626, circumscribes a court's

authority to order prospective or injunctive relief in a prison setting. Any such relief must be "narrowly drawn" and "extend no further than necessary" to secure an inmate's rights and must be "the least intrusive means necessary" to correct a violation of those rights. *Id.* § 3626(a). The court must also give "substantial weight" to any adverse impact on public safety or on the operation of the criminal justice system. *Id.*

In the sections that follow, the court will survey the areas of alleged noncompliance with federal and state law. Where the court finds violations of federal or state law, the court will order compliance. Much of the relief requested by plaintiffs falls beyond the scope of "least intrusive" and "narrowly drawn." That, however, does not diminish the fact that the City defendants, by their own admission or by failing to dispute the findings of the monitor, remain non-compliant with applicable state and federal law after years of litigation. The court is therefore compelled to order compliance. The order filed herewith, the court believes, is crafted in a way that is narrowly drawn and extends no further than necessary to achieve compliance while keeping in mind public safety and the operation of the criminal justice system.

## V. Basic Issues Concerning Access to Educational Services

### A. Definition of Entitled Inmate

The parties dispute the time-frame in which an eligible inmate becomes entitled to receive educational services. Citing one set of regulations, plaintiffs argue that an inmate becomes eligible after ten days of incarceration. *See* N.Y.Comp.Codes R. & Regs. tit. 9, § 7070.1 (stating that all "eligible inmates are entitled to receive educational services"); *id.* § 7070.2 (defining "eligible inmate" as one "incarcerated in a local correctional facility for 10 or more calendar days" or who is "expected to be incarcerated for a period of 10 or more calendar days").

The City defendants, pointing to another set of regulations, argue that they have an additional ten school days before an inmate becomes entitled to receive services. *See* N.Y.Comp.Codes R. & Regs. tit. 8, § 118.4 ("Instruction shall commence not later than the 11th school day following the school district's receipt of a request for educational services.").

No evidence has been submitted, however, that the City defendants have failed to provide services within ten days of incarceration. *See* Final Rep. at 10–11. The court will therefore not address the issue at this time. Should the City defendants cease to provide services within ten days of incarceration, plaintiffs can renew their request for a determination of the definition of "entitled inmate" under New York law.

### B. Notice and Requests for Services

■ In her Final Report the monitor expresses her dissatisfaction with the notification procedures the City defendants have utilized to inform eligible youth of their right to receive educational services. *See* Final Rep. at 12–16. The monitor notes three ways in which the City defendants attempt to apprize eligible inmates of their entitlement to educational services: (1) A videotaped presentation that covers a wide range of jail regulations and services is shown during facility orientation sessions, including a brief segment on the availability of educational services; (2) correctional officers read or paraphrase a few sentences from the *Request for Educational Services* form concerning eligibility prior to distributing them; and (3) a notice is posted in housing units, the law library, school hallways, and in program carts. *See id.* at 12. The monitor was

made aware of a version of the form available in Spanish, but she never observed it actually being made available to inmates during orientation. *Id.* In one instance, the monitor observed that detainees were required to complete the form prior to the video and prior to the oral presentation. *Id.* In every instance observed by the monitor, the staff member's oral presentation failed to "cover[ ] all of the information printed in Part IV of the *Request.*" Education Plan ¶ 10. The monitor ultimately concludes that the City defendants' practices and procedures "do not constitute sufficient notification and do not adequately encourage participation in educational services." Final Rep. at 12.

The monitor makes many thoughtful recommendations which, in her professional opinion, would increase levels of participation by incoming detainees. Plaintiffs urge the court to adopt the monitor's recommendations and compel the City defendants to implement the monitor's proposed notification scheme. Plaintiffs cite relevant state regulations in support of their request. *See* N.Y.Comp.Codes R. & Regs. tit. 9, § 7070.1 ("Eligible youth ... shall be encouraged to become involved in an educational program."); *id.* § 7070.4(d) ("Facility staff shall make reasonable efforts to assist all eligible youth, including those who may be non-English speaking, to understand the information provided concerning the educational services program.").

The City defendants respond by arguing that they have complied with the minimum requirements of the applicable state regulations. *See* N.Y.Comp.Codes R. & Regs. tit. 9, § 7070.4(b). The City defendants also state that they are in the process of modifying the admission orientation to include the presentation of a video produced by BOE, in English and Spanish, about its educational services.

The court cannot say that the City defendants' procedures for notification (i.e., the proposed BOE video presentation coupled with the requirements of paragraph 10 of the Education Plan) fail to "encourage" eligible youth or that they are "unreasonable." While the court has no doubt that plaintiffs' proposed procedures would result in more students participating, maximization of enrollment is not the business of the court—compliance with the law is.

The court finds, however, that the City defendants have failed to consistently and adequately follow the notification procedures mandated by the Education Plan and applicable regulations, both with regard to the oral presentations and in making translations available to non-English speakers. The court will therefore order the City defendants to comply with the terms of the Plan and applicable law.

C. Escorts and Security

The Final Report documents several instances of students arriving to class late or not at all because DOC failed to provide escort officers or sufficient security personnel. *See* Final Rep. at 16–17. This failure to provide escorts or sufficient security personnel resulted in many instances of inmates not receiving the total number of educational contact hours to which they are entitled by law.

In response, the City defendants have only controverted or (more accurately, clarified) two of the factual observations documented in the Final Report. *See* Conry Decl. ¶ 12. As for the other instances, the City defendants apparently concede that improvement is needed in this area because "DOC is implementing a 3–point remedial plan to ensure among other things that all compulsory education entitled inmates ... are brought to the school area, including inmates in mental observation and gay housing units." City Defs.'

Resp. at 12; *see also id.* at 9 ("DOC has instituted a 3–part education and self-monitoring program to rectify problems concerning timely arrival to class and to ensure that no compulsory education entitled inmates miss school unless legally excused from class."). This three-part program is described in the Conry Declaration. *See* Conry Decl. ¶¶ 11–13. The three-part program, however, is nowhere detailed in the city's proposed Corrective Action Plan.

The court hereby finds that the City defendants have repeatedly failed to provide escorts and sufficient security personnel to ensure that entitled inmates receive the total number of educational contact hours to which they are legally entitled. The court will therefore order the City defendants to assign a sufficient number of correction officers for escort and security in each facility during each school period so that each eligible inmate arrives on time and receives the minimum number of hours of educational services to which the inmate is legally entitled. The court will also direct the City defendants to establish appropriate procedures and training programs to effectuate this order.

**D. Minimum Instructional Time for General Educational Services**

■ The parties have spilled considerable ink concerning the minimum instructional time required by New York law. Plaintiffs argue that the City defendants must provide 5.5 hours of general education services daily (Monday through Friday) for compulsory-age inmates (i.e., 16 and 17–year–olds) and 3 hours per day for 18 to 21–year–olds. City defendants insist that they need provide only 3 hours per day for *all* eligible inmates.

Section VII of DOC Directive 3503R indicates that DOC's *policy* is that every reasonable effort should be made to provide space sufficient for BOE to provide 5.5 hours of instruction per day to compul-sory-age inmates and 3 hours per day to other eligible inmates. The City defendants argue, however, that they are not *required* to provide 5.5 hours of instruction per day.

In support of their argument, the City defendants point to section 3202 of New York Education Law which provides that

A person under twenty-one years of age who has not received a high school diploma and who is incarcerated in a correctional facility maintained by a county or by the city of New York or in a youth shelter is eligible for educational services pursuant to this subdivision and in accordance with the regulations of the commissioner.

N.Y.Educ.L. § 3202(7)(a). Part 118 of the state education commissioner's implementing regulations, entitled "Instructional Programs for Students Incarcerated in Correctional Facilities Maintained by Counties or the City of New York," states that "[t]he amount of instructional time provided to each student shall total not less than three hours per school day." N.Y.Comp.Codes R. & Regs. tit. 8, § 118.4(b).

Plaintiffs, in support of their argument for a minimum of 5.5 hours per day for 16 and 17–year–olds, point to section 3205 of New York Education Law, which provides that "each minor from six to sixteen years of age shall attend upon full time instruction," and that "the board of education shall have power to require minors from sixteen to seventeen years of age who are not employed to attend upon full time day instruction until the last day of session in the school year in which the student becomes seventeen years of age." N.Y.Educ.L. § 3205(1)(a), (3); *see also* By-laws of the Bd. of Educ. of the City of New York § 4.1 (June 20, 2001) ("Each minor child residing in New York City from six to seventeen years of age shall attend full

time instruction, except upon completion of a four year high school course of study."). In support of their argument that "full time" means a minimum of 5.5 hours per day, plaintiffs point to Part 175 of the commissioner's regulations, entitled "State Aid," which provides that

> The daily sessions for pupils in grades seven through 12 shall be a minimum of five and one-half hours including time spent by students in actual instructional or supervised study activities, exclusive of time allowed for lunch, and including hourly units of time spent by all teachers and other instructional staff within a grade level or school building attending upon staff development activities relating to implementation of new high learning standards and assessments as authorized by section 3604(8) of the Education Law.

N.Y.Comp.Codes R. & Regs. tit. 8, § 175.5(a)(3). Plaintiffs concede that eligible inmates aged 18 to 21 years of age are only entitled to 3 hours of instruction per day.

Plaintiffs also seem to argue that the City defendants have somehow waived their right to argue that they are only legally required to provide 3 hours of instruction per day to compulsory-age inmates:

> [The City defendants' argument] is an attempt to whitewash the fact that the City has long insisted that it *does* provide 5.5 hours of instruction to adolescents, and the monitors' [sic] reports demonstrate that, even this far into remedial litigation, it still has failed to do so. The City should not be permitted to threaten to provide fewer services in

response to its failure to meet its *own* standards.

Pls.' Reply at 7 (original emphasis).

The court is not persuaded by plaintiffs' arguments. The statute cited by plaintiffs speaks only in general terms while the statute cited by the City defendants specifically refers to incarcerated student programs. The regulation cited by plaintiffs indicates in its section heading and part heading that it concerns the "[l]ength of school day ... *for State aid purposes,*" and the regulation was implemented pursuant to a different statute than the one upon which plaintiffs' rely. N.Y.Comp. Codes R. & Regs. tit. 8, § 175.5 (emphasis added). Moreover, that same section of the regulations contemplates a fewer number of hours for alternative education programs.[2] *See id.* § 175.5(e). In contrast, the regulation cited by the City defendants, in its section heading, part heading, and substance, specifically indicates that it applies to instructional programs for incarcerated persons. *See id.* § 118.4. Moreover, its history indicates that it was enacted pursuant to section 3202 of New York Education Law. *See id.*

While the court is certainly sympathetic to plaintiffs' desire to maximize instructional time—a mere three hours of instruction per day strikes the court as rather anemic in the grand scheme of things—the court is of the opinion that New York law requires only three hours per day of instruction. While that amount is small, it is not so small as to be de minimis or nonexistent, and thus it is not in and of itself constitutionally infirm. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35 37, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Campaign for Fiscal Equity, Inc. v. State,*

---

**2.** Section 175.5(a)(3) also indicates that it applies to students in "grades seven through 12." Inmates at Rikers Island are not divided into "grades." Rather, they are divided into three groups for instructional purposes: Basic, Pre–GED, and GED. *See* Lisante Decl. ¶ 12. Section 175.5(a)(3) would therefore seem to not apply for this reason as well.

744 N.Y.S.2d 130 (N.Y.App.Div.2002) (describing minimal educational requirements under state constitution).

As for the City defendants' alleged misrepresentations concerning the amount of services they have provided, the fact that the City defendants may have said they intended to provided five and one-half hours of instruction per day is irrelevant to the determination of what they are legally obligated to provide. Moreover, the City defendants' position has always been that they were only legally required to provide three hours of instruction per day. *See* City Defs.' Mem.Supp.Mot.Summ.J. & Opp. Pls.' Mot. for Declaratory & Partial Summ.J. (12/20/99) at 13.

■ Despite the fact that the City defendants were obligated to provide three hours of instruction five days per week, the Final Report makes clear that the City defendants have failed to live up to that minimal obligation. *See* Final Rep. at 18–20. It is that failure to provide the obligatory minimum that has resulted in a continuing constitutional violation. *See Handberry v. Thompson,* 92 F.Supp.2d at 248–49. The city concedes that it has fallen short, promising to do better: "By next school year, BOE will provide a minimum of 3 hours of daily classroom instruction in all classroom settings for entitled inmates, the legally required minimum in a jail setting." City Defs.' Resp. at 10; *see also, e.g.,* Lisante Decl. ¶ 7(b) (Island Academy GED program for non-compulsory entitled inmates only meets 3 hours per day, 4 days per week). The court hereby finds that the City defendants have continued to fail to provide the minimum amount of instructional time to which plaintiffs are entitled under New York law. While the court appreciates the City defendants' promise to do better, the court will provide them with an additional incentive: a court order requiring them to comply with the law.

### E. Scheduling Conflicts

■ New York law provides that a jail's schedule must be organized so that no entitled inmate who opts to participate in educational services is denied the opportunity to also participate in (1) exercise, (2) legal services, (3) religious services, (4) visitation, and (5) health services because of a scheduling conflict. N.Y.Comp.Codes R. & Regs. tit. 9, § 7070.6(c). The monitor notes in the Final Report that inmates were sometimes forced to choose between commissary and educational services. *See* Final Rep. at 18. Commissary, however, is not included in the list of services that must be made available to students participating in educational services. The court will not, therefore, follow plaintiffs' (and the monitor's) suggestion that it order the City defendants to make commissary services equally available.

In any event, according to the City defendants, DOC now provides commissary services to entitled inmates by filling their commissary orders before all other orders or by scheduling make-up commissary. *See* Conry Decl. ¶ 14.

### F. Compulsory–Age Inmates and G.E.D. Checks

■ The Final Report identifies several instances of compulsory-age inmates, i.e., 16 and 17–year–olds, getting out of educational services by claiming to have already obtained a G.E.D. *See* Final Rep. at 19–20. The New York State Education Department has certain eligibility requirements which must be met before a 16 or 17–year–old can sit for the G.E.D. *See* N.Y. State Educ.Dept., Office of Workforce Prep. & Continuing Educ., G.E.D. Eligibility Requirements, available at < http://www.emsc.nysed.gov/workforce/ged/eligibility.html>. In her Final Report, the monitor concludes that it is unlikely that every compulsory-age inmate

claiming to already have a G.E.D. does, in fact, possess one.

The City defendants also seem to doubt that every compulsory-age inmate claiming to possess a G.E.D. already has one. They have therefore proposed a "3–point remedial plan" which will "ensure among other things that all compulsory education entitled inmates at ARDC are brought to the school area .... at which point BOE will attempt to verify from which program the inmate received his G.E.D." City Defs.' Resp. at 12.

The court hereby finds that not all compulsory-aged inmates are attending daily mandatory instruction because of the City defendants' willingness to accept an inmate's representations that he or she already possesses a G.E.D. The court will therefore incorporate into the order modifying the Education Plan the City defendants' proposed remedial steps for verifying whether a compulsory-age inmate has already obtained his or her G.E.D.

## VI. Curriculum and Instruction

### A. Assessment

■ The monitor noted that several inmates were not properly placed into classes ·because assessment tests for class placement were only made available in English. The City defendants do not dispute this finding, and the court hereby so finds.

The City defendants have indicated that they intend to begin placement testing in both English and Spanish. *See* City Defs.' Resp. at 12. The court will therefore incorporate into its order paragraphs 3 and 4 of the proposed Corrective Action Plan. Those paragraphs, however, do not provide for testing in Spanish. The court will therefore modify those paragraphs to en-

sure that testing in Spanish is made available.

### B. Organization of Curriculum

■ According to the monitor, "[t]he curriculum in the Rikers Island Academies is not differentiated to accommodate students' variable lengths of stay, an important limitation in an education program in a detention facility." Final Rep. at 21. The monitor recommends implementing a bifurcated curriculum—a short program designed to be completed in a few days which focuses on life skills coupled with a more traditional high school equivalency curriculum for inmates who are incarcerated for longer periods. Plaintiffs have asked the court to order the City defendants to implement such a curriculum.

The City defendants concede that lengths of stay are variable—from one day to sometimes over a year. They insist, however, that their current curriculum meets the needs of eligible inmates. They claim that their modular curriculum is organized into discrete units that are not dependent on previously learned material; inmates with different lengths of stay are thus accommodated. *See* Lisante Decl. ¶ 5(b), Ex. B. And in any event, the City defendants argue, the monitor's proposed curriculum is not required by governing law.

The court has reviewed the course syllabi annexed to the Lisante Declaration. While the court has some doubts as to the City defendants' assertion that each module is not dependent upon previous material,[3] on the limited record before it, the court cannot say that the current curriculum is so ineffectual as to be legally or constitutionally insufficient. Plaintiffs

---

**3.** For example, one mathematics course outline indicates that a topic for week 9 is "Review the Cartesian Plane." The fact that the Cartesian Plane is being *reviewed* implies that it was covered previously. Indeed, it was—6 weeks earlier, during week 3.

have cited no authority in support of their contention that it is.

While the court can certainly see merit in the monitor's recommendations regarding the bifurcated curriculum, such a curriculum is not *required* by law. *See* N.Y.Comp.Codes R. & Regs. tit. 8, § 118.4. The court will therefore not order the City defendants to implement such a curriculum.

## C. Instructional Strategies and Materials

█ The monitor documents in her Final Report several instances of students "sleeping, socializing, or otherwise not engaged in instructional activities." Final Rep. at 22. Her evaluation of the teaching strategies and methods employed by some teachers is also less than stellar. *Id.* at 22–23. She concludes that a "major factor" contributing to the teaching staff's ineffectiveness is the fact that the majority of teachers at Rikers Island are only "provisionally certified" by the state—i.e., unable to meet the minimum requirements for full teaching certification—while the majority of teachers at other New York City schools *are* fully certified. *Id.* at 23.

The City defendants do not dispute the monitor's observations. Rather, they simply argue that the quality of education alone does not implicate plaintiffs' due process right to the education process. *See Rodriguez,* 411 U.S. at 35–37, 93 S.Ct. 1278. The City defendants also do not dispute the monitor's conclusion that lack of certified teachers is a problem. Rather, they report that all provisionally certified teachers must become fully state certified by September 1, 2003, under new state Education Department rules. *See* Lisante Decl. ¶ 32, Ex. E. They also indicate that BOE has committed to two full-day, island-wide, staff development sessions, one focusing on new teachers and a second focusing on educational issues relating to this litigation. *See id.* ¶ 33, Ex. F.

The court questions whether it is competent (at least on this limited record) to opine on the appropriateness of any particular teaching strategy. However, the City defendants have not disputed the monitor's finding that 55% of the Rikers Island teachers are only provisionally certified while the rest of the system has a provisional certification rate of only 15%. The court so finds. The court also finds that this gross disparity has resulted in plaintiffs not receiving educational services to which they are entitled. The court will therefore order the City defendants to achieve parity with the rest of the city schools with respect to teacher certification by September 1, 2003.

## D. Library Services

█ BOE does not employ librarians in the Rikers Island Academies. In addition, according to the monitor, BOE does not maintain an adequate library. *See* Final Rep. at 24. Plaintiffs, citing state regulations, argue that the City defendants must employ a librarian and provide a sizable library for the use of students. *See* N.Y.Comp.Codes R. & Regs. tit. 8, § 91.1 ("A school library shall be established and maintained in each school."); *id.* § 91.2 ("Each school district shall employ a certified school library media specialist. . . .").

The City defendants respond by citing Part 118 of the state education regulations (dealing with the provision of instructional programs in correctional facilities) as well as the regulations' enabling statute, section 3202(7) of New York Education Law. None of these sources indicates that a school in a correctional facility must provide a library for its students. Moreover, argue the City defendants, the regulation dictating the minimum space that DOC must make available to BOE makes no mention of requiring space for a library. *See* N.Y.Comp.Codes R. & Regs. tit. 9,

§ 7070.3(c)(1) (DOC must "allocat[e] and maint[ain] classroom space within the facility which promotes safe and effective learning environments and accommodates the needs of education personnel and eligible youth."), (c)(6) (DOC must provide "a secure area within the facility for the storage of instructional materials, equipment and records, if education personnel or facility staff determine such an area is necessary.").

While the court agrees with the City defendants that the regulations and statute they cite are silent on the issue of library services, the language of the regulations cited by plaintiffs is unequivocal: "A school library shall be established and maintained in each school." N.Y.Comp. Codes R. & Regs. tit. 8, § 91.1. The City defendants consistently refer to the four schools on Rikers Island as "schools," "high schools," "high school programs," and the like. *See* Lisante Decl. The court can only conclude that the plain language of the regulations cited by plaintiffs require the City defendants to provide library services to eligible inmates.

Section 7070.3 of title 9 of the state regulations is not to the contrary. Provision of space for a library could easily fall within the regulatory requirement that DOC provide a "secure area with the facility for the storage of instructional materials." The court will therefore order the City defendants to comply with the requirements of state education regulations regarding the provision of library services.

## VII. Special Education

### A. Child Find, Screening, and Evaluation

■ The IDEA's "child find" provision places on school districts an affirmative obligation to identify, locate, and evaluate all disabled youth. *See* 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.125; *id.* § 300.300(a)(2). Incorporated into the original Education Plan was a paragraph which listed five different mechanisms for identifying inmates eligible to receive special education and/or related services: (1) the Child Assistance Program (CAP) computer database, (2) self-identification by the inmate, (3) BOE research into educational records not covered by CAP, (4) referrals by BOE personnel, and (5) outside sources such as state courts.

According to the monitor, this screening system "can reliably identify many special education students," but the City defendants have failed to consistently rely on these mechanisms. Final Rep. at 26. For example, CAP screening was not performed at Rosewood High School from mid-December 2000 to March 8, 2001, when the clerical staff member who normally reviewed the database was absent and BOE did not designate a replacement. *Id.* The City defendants have not disputed these observations and the court so finds.

Nevertheless, the City defendants claim that their screening methods are highly successful. For example, at the Horizons Academy, the City defendants claim to have a 97% success rate in identifying students who receive, have received, or are/were being evaluated to receive special education services. *See* Lisante Decl. ¶ 16. The court, however, questions the relevance of this statistic for it says nothing about inmates who *need* special education services and have nevertheless remained unidentified.

In any event, the monitor's observations indicate that the City defendants have failed to live up to the bare terms of the original Education Plan. The court's order modifying the Plan will therefore reiterate the requirements of the Plan and will require the City defendants to utilize all of the resources previously identified by the City defendants in the Plan. Plaintiffs urge the court to require BOE to check records on CAP within two days of enrollment.

The court feels that two days is overly constraining and would not permit reasonable delays caused by foreseeable yet unexpected events such as system breakdowns or employee illness. The court will therefore give BOE five days to perform CAP checks.

### B. IEP/TEP Issues

■■■ The IDEA and its implementing regulations contain very specific requirements regarding the development of an Individualized Education Plan ("IEP") for each disabled student. *See* 20 U.S.C. § 1401(11); *id.* § 1414(d). Under the IDEA, a disabled student is entitled to a free appropriate public education that conforms to his or her IEP. *Id.* § 1401(8)(D). "[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). The IEP represents the "centerpiece of the [IDEA's] education delivery system for disabled children." *Id.*

Delivering educational services to disabled students in incarceration, however, presents unique challenges beyond the ken of a traditional IEP. For example, many students are in custody at Rikers Island for only a few weeks at a time, while an IEP typically focuses on ways of meeting long term goals and objectives in a more stable, long(er) term educational setting. As a result, an "interim" or "temporary" education plan ("TEP") is often developed and implemented for students in the Rikers Island schools. While a TEP is functionally similar to an IEP, it is not a replacement. It is designed as a temporary fix until a more functional and appropriate IEP can be developed for the student and implemented.

The monitor has identified six issues with regard to IEPs and TEPs, and the court will address them seriatim.

■■■ *1. Retrieving Prior IEPs.* The Education Plan makes clear that a TEP should be developed and utilized in conjunction with any prior, existing IEP. *See* Education Plan ¶ 10. The monitor has noted, however, that the Rikers Island Academies "do not consistently request or receive IEPs from previous schools." Final Rep. at 30. The monitor cites several examples in support of this conclusion. The City defendants do not dispute the substance of the monitor's findings; rather, they indicate that their previously "problematic" rate of retrieval has "greatly improved to the current retrieval rate of 74%." Lisante Decl. ¶ 19, Ex. D. While some improvement is certainly a good thing, the court finds that the current rate, even if true, is still unacceptably low. The delays caused by the BOEs failure to obtain prior IEPs deprive a sizable percentage of students of services to which they are legally entitled. The court will therefore order the City defendants to develop and implement procedures to increase the IEP retrieval rate.

■■■ *2. Failure to Develop and Implement TEPs.* The monitor documents numerous instances of the schools on Rikers Island failing to develop and implement TEPs for special education students. *See* Final Rep. at 28–29. The City defendants dispute one of the monitor's observations (regarding TEPs at the Sprungs program) but do not otherwise dispute her findings. *See* City Defs.' Resp. at 16–17. The court therefore adopts the monitor's findings regarding the development and implementation (or lack thereof) of TEPs. As a result of this failure to consistently develop and implement TEPs, eligible students are deprived of special education services to which they are legally entitled.

The court will therefore order the City defendants to timely develop and implement TEPs for all eligible students.

■ *3. Goals and Objectives.* The monitor notes that the TEPs developed in the Rikers Island schools do not include short-term objectives in disability areas affecting educational performance. Specifically, the monitor reviewed seventy-five TEPs developed between October 2000 and June 2001, including TEPs developed for students who were demonstrating behavioral problems in each of the four Rikers schools, and found that none included goals and objectives to address behavioral or social skills. Final Rep. at 31. The City defendants concede that they have fallen short in this area and the court so finds. *See* City Defs.' Resp. at 17–18; City Defs.' Reply at 8. They have indicated that they are in the process of developing specifically targeted training for education evaluators, psychologists, and social workers so that future TEPs will provide "more individually tailored and measurable educational and behavioral goals appropriate for the student, taking into consideration both his or her educational and social history and incarcerated status." *Id.*

While the court appreciates the representations made by the City defendants, the court notes that the City defendants have failed to live up to all of the representations made in their original Education Plan. The court will therefore order the City defendants to include appropriate goals and objectives in TEPs.

■ *4. IEP/TEP Team Participants.* The monitor notes, and the City defendants recognize, that parents and general education teachers often do not participate in IEP/TEP Teams. *See* Final Rep. at 31; City Defs.' Resp. at 18; City Defs.' Reply at 8. BOE "believes" that much of the purported non-participation by these persons is due to what amounts to a scrivener's error. *Id.* The statute and implement-

ing regulations make very clear, though, whose participation is required on an IEP/TEP Team. *See* 20 U.S.C. § 1414(d)(1)(B). The court will therefore order the City defendants to comply with the terms of the statute. The court will also require the City defendants to better document individuals' participation in IEP/TEP Teams.

■ *5. Annual Review and Triennial Evaluation.* The monitor notes, the City defendants do not dispute, and the court hereby finds that BOE does not conduct annual reviews or triennial evaluations when those dates fall due while a student with an IEP is in custody. *See* Final Rep. at 32. Simply because a student may be incarcerated for less than a year does not exempt BOE from the requirements of conducting reviews and evaluations. *See* 20 U.S.C. § 1414(a)(2), (d)(3). The court will therefore order the City defendants to comply with the review and evaluation requirements of 20 U.S.C. § 1414. As for TEPs, the City defendants have suggested a retesting and review of an inmate's TEP sixty to eighty days after implementation. The court will incorporate the City defendants' suggestion into its order.

■ *6. Extended Year Services.* The monitor notes that "the TEP process does not include consideration of students' needs for extended school year services and the Rikers Island Academies do not provide those services." Final Rep. at 33. The City defendants do not contest the finding. They merely respond by stating that "BOE is endeavoring to meet its extended school year needs through itinerant teachers and related services providers." City Defs.' Reply at 8. The regulations, however, *require* the provision of extended year services when appropriate. 34 C.F.R. § 300.309. "Endeavoring" alone, while appreciated, is insufficient. The court will therefore order the provision of extended year services.

## C. Continuum of Services

■ The monitor notes several problems with the range of special education services provided on Rikers Island. Skills support classes, while mandated by the Education Plan, have not been consistently delivered. Moreover, classes are often too large and unwieldy, teachers are often not fully certified in special education, and necessary facilities and classes for students with the severest needs were not provided. *See* Final Rep. at 33–35.

The City defendants do not dispute the substance of the observations. Rather, they respond by proposing to offer an amorphous one-size-fits-all "skills class" either taught by a special education teacher or by a subject area teacher in consultation with a special education teacher. *See* Corrective Action Plan ¶ 7. Such an offering is less than what the City defendants are required to provide under the terms of the original Education Plan, *see* Education Plan ¶ 18, Ex. C, at 1–2, and falls far short of the sort of individualized services required by the IDEA. *See e.g.,* 34 C.F.R. § 300.5; *id.* § 300.301; *id.* § 300.551. The court will therefore order the City defendants to provide disabled students with an appropriate range of services.

## D. Related Services

■ Disabled students who require related services such as counseling, speech therapy, and vision services are entitled to receive these services under the IDEA. *See* 34 C.F.R. § 300.24. The monitor claims that the City defendants have not provided counseling services to students who require them. *See* Final Rep. at 35–36. The City defendants dispute this finding, claiming that in addition to providing counseling services mandated by TEPs, they provide *all* students with access to counseling. City Defs.' Resp. at 19; Lisante Decl. ¶ 5(n). The monitor also claims that the space provided for counseling is not always adequate, particularly with regard to privacy concerns. *See* Final Rep. at 36. The City defendants respond that the space, while not ideal, is adequate, and that privacy concerns must be balanced against security concerns. City Defs.' Resp. at 19. The City defendants also state that they will modify existing space to create an additional office or room for counseling during school hours at the George R. Vierno Center. Corrective Action Plan ¶ 9.

As for speech and language services, the monitor notes that adequate space has not been provided, and that many students have gone without these services despite requiring them. Part of the problem has been one of short staffing. *See* Final Rep. at 36–37. The City defendants have informed the court that a second bilingual speech and language therapist has been hired for Rikers Island. *See* Lisante Reply Decl. ¶ 13. BOE insists that this new hire will remedy the shortcomings documented by the monitor. *Id.*

As for hearing and vision services, the monitor documents numerous instances of students not being provided with required hearing or vision services. *See* Final Rep. at 37–38. While the City defendants have indicated that they are implementing procedures to address this weakness, there is no evidence that contradicts the observations of the monitor. *See* Lisante Decl. ¶ 28. Moreover, there is no indication that these newly implemented procedures will prove adequate.

The undisputed findings of the monitor thus indicate that the City defendants have failed to provide all required related services, and the court so finds. The court will therefore include in its order appropriate language requiring the City defendants to provide such services. The court will also incorporate the City defendants' representation that additional counseling

space will be made available at the Vierno Center. The court will defer, however, to the City defendants with regard to security issues related to counseling.

E.   Transition Services

▮ Under the IDEA, an IEP (or TEP) must include "a statement of the transition service needs" of the entitled student.   20 U.S.C. § 1414(d)(1)(A)(vii); *see also* 34 C.F.R. § 300.347(b).   This statement must "focus[ ] on the child's courses of study (such as participation in advanced-placement courses or a vocational education program)."   20 U.S.C. § 414(d)(1)(A)(vii).   The statement must also include, when appropriate, "a statement of the interagency responsibilities or any needed linkages."   *Id.*

During her tenure, the monitor reviewed numerous TEP documents at Rikers Island and found that the transition goals contained therein "were very general and similar for all students rather than specific and individualized, and they did not identify any planning or services to be provided by the Rikers Island Academies to prepare students to meet the goals."   Final Rep. at 39.   The monitor quotes excerpts from several TEPs in support of her conclusion. The City defendants do not dispute this observation.   They simply opine that this failure to individualize and state specific transition goals "does not deprive any special education entitled inmate of his [sic] property interest in special education." City Defs.' Resp. at 19.

The court hereby finds that the City defendants have failed to provide disabled students with adequate statements of transition service needs.   Section 1414 and its implementing regulations go into great detail about how IEPs are to be individually tailored to the needs of individual students and mandated services provided accordingly.   The one-size-fits-all approach to transition services currently utilized by the City defendants clearly falls short.   The court will therefore order the City defendants to comply with the requirements of the IDEA with respect to the provision of transition services.

Finally, the monitor reports that some students have had difficulty enrolling in BOE community schools after release. The City defendants claim that if a community school refuses to enroll a discharged inmate, that inmate can still enroll in programs run by the Alternative Superintendency's office.   The court will hold the City defendants to that representation.

## VIII. Cell Study

▮ Two years ago, when the City defendants submitted their Education Plan, they indicated a commitment to

operate a cell study program for entitled inmates who cannot attend classes due to security, safety, or medical reasons. DOC is responsible for delivering cell study materials to inmates participating in the cell study program by the end of school day following DOC's receipt of such materials from the Board.   The Board is responsible for the instructional component.   A teacher shall continue to be available to interact with entitled inmates receiving cell study, by telephone, escorted visit, or other appropriate contact, in accordance with Section IX of DOC Directive 3503R.

Education Plan ¶ 7. Directive 3503R provides that "[i]nstruction may be provided in person, by telephone, by video-conferencing, by computer, etc., as deemed appropriate by the teacher and the facility." Education Plan Ex. B. The court approved the City defendants' Education Plan despite the fact that the court found the plan "deficient in many respects."   Order, June 29, 2000, ¶ 2.

Now, two years later, the monitor informs the court that the City defendants

have failed to live up to the representations regarding the provision of cell study that the City defendants made two years ago. She notes that (and the City defendants do not dispute that) the *only* service made available to segregated inmates is generic, photocopied materials combined with occasional, woefully brief telephone instruction sessions, only when the telephones were actually working. When telephone instruction actually took place, the length of instruction sessions ranged from five to twenty-five minutes per day. Compulsory-age inmates were often only provided with this pathetic level of educational services when they actually asked for them. Many compulsory-age students were provided with no instruction at all. No special education or related services were provided to inmates in cell study programs, despite an indication that a disproportionate number of special education students are confined in segregated housing areas. Spanish-language cell study was not consistently made available. In sum, the court finds that the City defendants' performance in this area has been particularly abysmal. *See* Final Rep. at 40–42.

The City defendants' response to these findings is to claim that generic, photocopied worksheets combined with five minutes of phone instruction per day is "legally sufficient." City Defs.' Resp. at 21. Even assuming that to be the case (ludicrous as that assumption may be), the City defendants' have failed to provide even that.

The City defendants also cite two purported "incidents" which allegedly demonstrate the dangers posed by anything other than this most restrictive from of instruction. Ignoring the fact that the City defendants have submitted no declarations or affidavits of persons with personal knowledge of these "incidents," the court is shocked that the City defendants would, in effect, punish in perpetuity each and every inmate in segregated housing because of the behavior of a few. The City defendants cannot deprive an individual of educational services to which he or she is entitled because of the actions of another individual. Rather, they can only deny or restrict services if the individual "presents a clear threat to himself/herself, the safety of other inmates and/or the safety of educational or facility staff." N.Y.Comp.Codes R. & Regs. tit. 9, § 7070.7; *see also* Education Plan ¶ 24. The regulations and the Education Plan spell out in great detail what is required to denominate someone as posing as "clear threat." At no time during the monitor's tenure were *any* eligible inmates found to be a "clear threat." Final Rep. at 12. Nevertheless, as the monitor's observations make clear, inmates in segregated housing were regularly denied services.

Given this sorry state of affairs, the court has no choice but to order defendants to, at a minimum, live up to the representations made previously in the Education Plan. Plaintiffs, in their proposed order, seek to have the court direct the City defendants to go beyond that and provide the broadest possible array of instruction for inmates in segregated housing, up to and including group instruction in a classroom setting in a school area. The court is not willing to go so far. The court is keenly aware of the penalogical interests that must be taken into consideration, and students in segregated housing are no doubt being segregated for a reason. Ordering the City defendants to provide group instruction in school areas to segregated students would, in effect, do away with segregation altogether. This the court is unwilling to do.

## IX. Other Issues

Plaintiffs urge the court to order the City defendants to implement other recom-

mendations of the monitor, including her recommendations concerning staffing, budgeting, internal monitoring, and space and school maintenance. The court declines to act on these requests at this time. Most of these areas involve internal DOC and BOE management and procedures, and the court does not believe it should engage in this sort of micro-managing. The court must concern itself only with the City defendants' compliance with the law. Precisely *how* the City defendants achieve compliance is up to the City defendants themselves.

Assuming Dr. Meisel is available and willing, the court will reappoint her to serve as monitor for the period September 1, 2002, to August 31, 2004. The monitor will assess the City defendants' compliance with the order filed herewith and will provide the court and counsel with semi-annual reports specifically identifying any areas of noncompliance. The reports may also contain recommendations for further modifications to the amended Education Plan. The monitor in her report may also recommend specific changes in BOE and DOC policies and procedures.

## X. Conclusion

For the foregoing reasons, the court will order modification of Education Plan as indicated in the order filed herewith.

### ORDER

### ORDER AMENDING THE CITY DEFENDANTS' *EDUCATION PLAN*

For the reasons stated in the Opinion filed herewith on this date, is hereby **ORDERED, ADJUDGED,** and **DECREED** as follows:

### General Provisions

1. This Order incorporates by reference the provisions of the Education Plan adopted by order of the court on June 29, 2000. If any conflict or ambiguity arises between the Education Plan and this Order, this Order controls.

2. Unless otherwise provided herein, this Order shall take effect thirty days after entry.

### Notice and Requests for Educational Services

3. DOC shall comply with the procedures and requirements of paragraph 10 of the Education Plan.

4. In addition to following the procedures and meeting the requirements of paragraph 10 of the Education Plan, BOE shall produce a videotape on the educational services it offers to entitled inmates. The videotape will be shown at DOC's new admissions orientation to all newly admitted inmates under 22 years of age who are incarcerated on Rikers Island. The videotape, the oral presentation required by paragraph 10 of the Education Plan, and any printed materials distributed at orientation will be made available in Spanish and English.

5. For any eligible inmate who does not understand English or Spanish, DOC shall make a good faith, reasonable effort to inform the inmate in a language he or she can understand about the inmate's right to educational services as soon as possible after his or her admission to DOC.

### Provision of Educational Services

6. Unless stated explicitly to the contrary, any and all requirements set forth in this Order shall apply to all of the schools, programs and methods of instruction operated by BOE in DOC facilities.

7. BOE and DOC shall make educational services available to all eligible inmates. Attendance at educational services is compulsory for all eligible inmates who are under 18 years old. Attendance at educational services is optional for all other eligible inmates and shall be made available to them upon request.

8. All eligible inmates shall receive a minimum of 3 hours of educational services daily, 5 days per week.

9. When a 16 or 17–year–old inmate asserts that he or she has either a high school diploma or a general equivalency diploma, the inmate shall be brought to the applicable BOE school in his or her jail. If BOE can verify that the inmate has obtained a high school diploma or a general equivalency diploma, the student may decline to participate in BOE-provided educational services and shall be excused from school while incarcerated.

10. BOE shall ensure that all teachers teaching at Rikers Island are fully certified by September 1, 2003.

11. BOE shall provide two full-day staff development sessions, one each semester, for educational staff at the Rikers Island schools. The Fall session will focus on issues faced by teachers who are new to Rikers Island and/or teaching generally. The Spring session will focus on issues specific to *Handberry v. Thompson.* Issues at these seminars may include integrated classroom instruction and management, referral for and implementation when needed of assisted intervention services tailored for an incarcerated population, development and implementation of Temporary Education Plans, etc.

12. BOE and DOC shall provide library materials and services to students in the Rikers Island Academies in accordance with sections 91.1 and 91.2 of title 9 of the New York Compilation of Codes, Rules and Regulations. BOE and DOC shall have six months from the date of entry of this order to comply with the terms of this paragraph.

**Escorts, School Schedule and Security**

13. DOC shall assign a sufficient number of correction officers for escort and security for each school program in each facility during each school period (i.e., classroom, extended day, small group, one-on-one, dayroom, and cell study) so that each eligible inmate arrives on time for the school program and receives at least the minimum number of hours of educational services as set forth in this Order.

14. DOC shall ensure the orderly and regular movement of eligible inmates to the school area by the establishment of procedures, including passes or personal escorts. Any time allotted or actually spent for the movement of eligible inmates shall not be considered time allotted or spent for the provision of educational services.

15. DOC shall ensure that the provision of basic jail services does not conflict with the school schedule. Each facility's schedule of activities, programs and services shall be organized so that no eligible inmate who participates in educational services is denied the opportunity also to participate in the following programs or services because of attendance at educational instruction: 1) recreation, 2) legal services, 3) religious services, 4) visitation, and 5) health services.

16. Correctional staff shall be trained as to their responsibilities under this Order and the Education Plan. Within 90 days of the entry of this Order, DOC shall report to counsel the schedule for such training; the areas to be covered in such training so as to ensure that all staff receive training in a timely manner consistent with the requirements of this Order and the Education Plan; which DOC staff members will be provided such training and the frequency with which they will receive it; and the sanctions, if any, that will be imposed on staff if they do not attend. Thereafter, at a minimum, DOC will provide training to its staff as set forth on this schedule.

**Assessment and Placement**

17. In addition to the provisions of paragraphs 10, 11, and 12 of the Education

Plan, on or before the tenth school day following BOEs receipt of a Request for Educational Services as outlined in paragraph 11 of the Education Plan, BOE shall conduct a diagnostic academic placement test for each entitled inmate, and shall screen each entitled inmate in its CAP, ATS and UAPC computer systems (or any replacement system).

18. BOE shall implement a diagnostic academic placement test such as the diagnostic version of the Test for Adult Basic Education for use in assessing and placing entitled inmates. BOE shall provide to its staff members who administer, interpret, and review this test, training on how to administer, interpret and/or review the test results. BOE shall develop guidelines on screening for skills class placement and assisted intervention services, as warranted.

**Special Education Services**

19. The City defendants shall comply with the requirements of 20 U.S.C. § 1412(a)(3)(A), 34 C.F.R. § 300.125, and 34 C.F.R. § 300.300(a)(2), and shall implement screening procedures to locate, identify, and evaluate all eligible inmates with disabilities.

20. Within five school days of an inmate's enrollment in a BOE school program, any inmate whose name has not been previously checked on CAP shall be so checked.

21. Within two school days of an inmate's identification through CAP as being in need of special education or related services or in the evaluation process shall be referred to the school based support team or pupil personnel team. The school based support team or pupil personnel team shall meet with the inmate within five days of the referral.

22. Inmates may also be identified as in possible need of special educational services through self-referral, research into other educational records, referrals from BOE or DOC personnel, referrals from outside sources such as the courts and other agencies, and referrals from parents and guardians. The school based support team or pupil personnel team shall meet with any inmate for whom identification as a special education student has been requested by any of these sources. The meeting shall take place within five days of the request. The purpose of this meeting shall be to determine if identification and assessment of that inmate as in need of special educational services is appropriate. If so, then an initial evaluation for special education shall be performed pursuant to the procedures set forth in 20 U.S.C. §§ 1414–1415 and their implementing regulations.

23. Within three school days of any inmate having been identified as previously having received special educational services, BOE staff at Rikers Island shall request in writing the Individualized Education Plan ("IEP") of that inmate developed most recently before his or her incarceration. BOE shall make best efforts to obtain the IEP of an inmate within ten school days. Within thirty days of the entry of this order, BOE shall develop and implement written procedures for achieving this goal and shall provide copies of these procedures to plaintiffs' counsel. BOE shall also maintain a list of all IEPs not obtained within thirty school days together with the reason given for the failure to obtain any IEP.

24. If a student has an existing IEP, BOE shall implement it to the extent it can be implemented in a correctional facility. If necessary and appropriate, a student's IEP may be revised, as defined in 20 U.S.C. § 1414(d)(4) and 34 C.F.R. § 300.346. The revised IEP may be referred to as a Temporary Education Plan or TEP.

25. If a student has an existing IEP, service and placement mandates can be modified only once the IEP/TEP team has documented the basis for a change in the needs of the student or why a previously identified service is not available at Rikers Island.

26. If a student has an IEP that is not current, BOE shall make best efforts to provide those services and related services recommended on the prior IEP until a TEP is developed. A TEP must be developed and implemented within thirty school days of the student's commencing participation in any BOE school or program at the Rikers Island Academies. The TEP shall be created by an IEP/TEP team in accordance with 20 U.S.C. § 1414(d)(1)(B) and 34 C.F.R. § 300.344. If for any reason a required member of the IEP/TEP team fails to participate (either in person or telephonically), the reason(s) for his or her nonparticipation shall be documented in the TEP itself.

27. An IEP/TEP must contain an assessment of the student's level of performance, including how his or her disability affects involvement in the curriculum. It shall also include measurable annual and short term academic and social/behavioral objectives as determined to be necessary for each student to improve performance, including benchmarks or short-term instructional objectives, evaluative criteria, evaluation procedures, and schedules to be used to measure progress toward the annual goal. These shall be measurable intermediate steps between the student's present levels of educational performance and the annual goals. The IEP/TEP must also include a statement of the special education and related services that are to be provided to the student; dates for the initiation and duration of these services; a transition plan; and consideration of the need for extended year services.

28. If a disabled student has an existing IEP, within sixty calendar days of the student's arrival at Rikers Island, BOE shall determine if an annual review or a triennial evaluation pursuant to 20 U.S.C. § 1414 is due or may become due during the student's incarceration. If so, BOE shall conduct such a review or evaluation consistent with the requirements of the Individuals with Disabilities in Education Act, 20 U.S.C. §§ 1400 *et seq.*

29. Any inmate for whom a TEP has been developed shall be given the diagnostic academic placement test outlined in paragraphs 17 and 18 above, not earlier than sixty school days nor later than eighty school days following the implementation of the inmate's TEP. The results of this retest shall be reviewed by the appropriate member of the school based support team to determine whether a formal re-evaluation of the TEP is warranted. The results of the review of the retest shall be recorded by the reviewer in the inmate's educational folder.

30. In the event an IEP or TEP for a student at one of the Rikers Island Academies calls for the provision of extended school year services, such services shall be provided.

31. Unless expressly set forth herein, nothing in this order limits eligible inmates' rights under the Individuals with Disabilities in Education Act, 20 U.S.C. §§ 1400 *et seq.*

32. A range of special education services shall be available at each of the Rikers Island schools and programs to meet the needs of disabled students, including but not limited to, general classroom instruction, with supplementary aids and services; skills support classes; resource rooms; and self-contained classes for students with intensive needs. For students who cannot communicate in the English language, BOE shall make best efforts to

provide the services in a language understood by the student.

33. A range of related services shall be available at each of the Rikers Island Academies schools and programs, including counseling, speech therapy, and vision and hearing services as needed by each disabled student. For students who cannot communicate in the English language, BOE shall make best efforts to provide the related services in a language understood by the student.

34. · DOC shall modify existing space to create an additional office or room for counseling during school hours at the George R. Vierno Center.

35. Class size in classes containing students identified as in need of special educational services shall be maintained at the smallest (most restrictive) class size recommended on the IEP or TEP of any student enrolled therein.

36. Self-contained special educational classes, resource room, and skills support classes must be taught by teachers certified to teach special education.

37. Transition services as defined in 20 U.S.C. § 1414(d)(1)(A) and 34 C.F.R. § 300.347(b) shall be recommended for each disabled student on his or her IEP or TEP. This planning shall include the identification of specific goals and instructional services to prepare students for continued education, employment, and community integration including, where appropriate, a statement of inter-agency responsibilities or any needed linkages such as with agencies responsible for housing, vocational, or educational training, and employment services. Such services, including instruction, development of employment objectives, and acquisition of living and vocational services as recommended on a student's IEP/TEP shall be provided.

38. BOE shall ensure that students released from DOC custody have the opportunity to attend BOE comprehensive or alternative high school programs after their release, regardless of the timing of the a student's release.

**Cell Study**

39. An inmate otherwise eligible for educational services may have his or her access to educational services restricted and denied, if necessary, if DOC determines that the provision of educational services to the inmate would present a clear threat to the security of the school, the staff, the inmate, or other inmates.

40. Eligible inmates shall not be restricted from or denied access to educational services solely on the basis of their placement in a special housing area, including, but not limited to, punitive or administrative segregation.

41. Educational services shall be provided to each eligible inmate in special or segregated housing. At a minimum, instruction will be provided by telephone, supplemented with appropriate written materials. Other forms of acceptable instruction include computer-assisted learning, video-conferencing, and in person instruction (either through cell openings or in-cell). Compulsory-age inmates shall receive a minimum of one hour of instruction per day. An equal amount of instruction will be made available to other entitled inmates upon request.

42. Educational services shall be provided to an inmate in special or segregated housing using the least restrictive method consistent with a determination by DOC that the inmate presents a clear threat to teachers, staff, the inmate, or other inmates. In order to place an inmate in a more restrictive method of educational services, DOC shall make a written determination in accordance with title 9, section 7070.7 of the New York Compilation of Codes, Rules and Regulations that the inmate presents a clear threat in any lesser

restrictive option. The mere fact that an inmate has been charged or convicted of a disciplinary infraction shall not be a sufficient basis for restricting or denying the provision of educational services.

43. No restriction or exclusion from educational services shall be in effect for longer than fourteen days, except as provided in title 9, section 7070.7 of the New York Compilation of Codes, Rules and Regulations.

44. Inmates who are disabled and identified as in need of special education or related services shall continue to receive such services even if placed in a restricted method of instruction. If necessary, an IEP or TEP may be modified in accordance with 20 U.S.C. § 1414(d)(4) and 34 C.F.R. § 300.346, consistent with legitimate penological objectives. In the event this occurs, such modifications shall be the least restrictive necessary to accommodate the security needs of the jail.

45. Each eligible inmate receiving educational services, even if according to a restricted method of instruction, shall receive bilingual instruction if required by the individual student.

**Reappointment of the Monitor**

46. Assuming Dr. Sheri Meisel is willing, the court hereby reappoints her to serve as a monitor from September 1, 2002, through August 31, 2004. The monitor will assess the City defendants' compliance with this order and provide the court and counsel with semi-annual reports specifically identifying any areas of noncompliance. The reports may also contain recommendations for further modifications to the Education Plan as amended by this Order. The monitor in her report may also recommend specific changes in BOE and DOC policies and procedures.

47. The monitor shall have the same access to Rikers Island, to plaintiffs and defendants, and to relevant documents, and shall have her expenses reimbursed and receive the rate of compensation as during her prior appointment as monitor.

**Modification and Enforcement**

48. Any party may move for reconsideration of any part of this Order within thirty days of its entry. This Order will remain in full force and effect during the pendency of any motion for reconsideration unless and until the court provides otherwise. Any motion for reconsideration must comply with the Federal Rules of Civil Procedure, this court's Local Rules, and relevant case law.

49. After thirty days following entry of this Order, any party may seek modification of this Order only if there has been a material change in circumstances or within thirty days of issuance of one of the monitor's semi-annual reports.

50. Either party may move to enforce or terminate this Order under the governing legal standards established by the Federal Rules of Civil Procedure, any relevant statutes, and applicable case law.

**SO ORDERED.**