Zakunda–Ze HANDBERRY; Marlon Coleman; Jose Colon; Irving Nooks; Austin Nunez; Carlos Luscz; Michael Picart; Carlos Rivera, Dr.; Joseph Valdez; Eugene Bailey; Anthony Wager, individually and on behalf of other persons similarly situated, Plaintiffs–Appellees–Cross–Appellants,

v.

William C. THOMPSON, Jr.; Jerry Cammarata; Carol Gresser; Irene Impellizzeri; Sandra Lerner; Luis Reyes; Ninfa Segarra; Rudolph Crew; Richard Mills; Michael Jacobson; Eric Taylor; Frederick Patrick; The Board of Education of the City of New York; The City of New York, Defendants–Appellants–Cross–Appellees.

Docket Nos. 03–0047(L), 03–0065(XAP).

United States Court of Appeals, Second Circuit.

Argued: Nov. 29, 2004.

Decided: Jan. 17, 2006.

54

Janice Birnbaum, Assistant Corporation Counsel, New York City Law Department (Michael A. Cardozo, Corporation Counsel, Leonard Corner and Jane L. Gordon, Assistant Corporation Counsel, of counsel), New York, NY, for Appellants–Cross Appellees.

Dori A. Lewis, The Legal Aid Society, Prisoners' Rights Project (Steven Banks, Mary Lynne Werlwas, John Boston, of counsel), New York, NY, for Appellees–Cross–Appellants.

Before: NEWMAN, SACK, and HALL, Circuit Judges.

SACK, Circuit Judge.

This litigation was brought as a class action by inmates in New York City jails challenging the defendants' asserted failure to provide them with educational services to which they are entitled under New York State and federal law. After several years of litigation, the district court (Constance Baker Motley, *Judge*) granted a declaratory judgment to the plaintiffs, concluding that the defendants had failed to provide such services, and ordered the defendants to create a plan for doing so. The court later adopted the defendants' proposed plan and appointed a third party to monitor the plan's execution for one year.

Upon receiving the third-party monitor's final report, the district court entered an injunction ordering the defendants to comply with the terms of their educational plan and to provide additional required services to eligible inmates. The defendants appealed and we vacated the injunction, remanding for the district court to consider whether *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), required the plaintiffs to exhaust administrative remedies. *See Handberry v. Thompson,* Nos. 02–0251, 02–0279 (2d Cir. Nov. 27, 2002) (order). The district court concluded that *Porter* did not require exhaustion in this case, and reinstated the injunction. The New York City defendants (the "City defendants") now appeal, arguing that the district court erred in its application of federal and state law. We affirm in part, vacate in part, and remand.

## BACKGROUND

The district court thoroughly set forth the facts underlying this dispute. *See Handberry v. Thompson,* 92 F.Supp.2d 244 (S.D.N.Y.2000) ("*Handberry I*"), and *Handberry v. Thompson,* 219 F.Supp.2d 525 (S.D.N.Y.2002) ("*Handberry II*"). We recite them here only insofar as we think it necessary to explain our resolution of this appeal.

The instant lawsuit arises out of a complex of allegations that the New York City Department of Education ("DOE") and Department of Corrections ("DOC") have failed to provide inmates incarcerated at New York City's vast Rikers Island prison facility with sufficient educational services and facilities to meet standards imposed by federal and state law. On August 14, 1996, the plaintiffs filed suit on behalf of themselves and others similarly situated, "in order to receive the educational services guaranteed them by law." Compl. ¶ 1. They assert that the DOE and DOC provided "less than half of school-eligible persons incarcerated by DOC with [state and federally] mandated educational services," *id.,* and that they did not provide general education services to all eligible inmates or special education services to school-eligible inmates with disabilities. The plaintiffs further contend that the defendants thereby violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment; the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482; 42 U.S.C. § 1983; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"); the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 (the "ADA"); and New York State law and regulations. The plaintiffs sought declaratory and injunctive relief "requiring [the defendants] to provide all mandated educational services to all school-eligible persons." Compl. ¶ 3.

On October 21, 1996, defendant Richard Mills, the Commissioner of the New York State Education Department, moved to dismiss the complaint on the ground, *inter alia,* that the plaintiffs had failed to exhaust all available administrative remedies.

As discussed below, both the IDEA and the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (the "PLRA"), establish exhaustion prerequisites for bringing suits such as this one. The City defendants opposed the motion to dismiss. They asserted that, as of that time, there were no applicable administrative remedies for the plaintiffs to exhaust, although the City defendants purported to reserve the exhaustion argument pending discovery. On May 28, 1997, the district court denied defendant Mills's motion to dismiss.

On November 19, 1999, the district court directed the plaintiffs to file a motion for a declaratory judgment establishing that their rights to receive education services had been violated and for an order directing the defendants to file an educational plan for meeting their obligations to provide such services. The plaintiffs filed the motion in December 1999. The City defendants cross-moved for summary judgment, asserting that the plaintiffs' claims should be dismissed for failure to exhaust all available administrative remedies.

On January 13, 2000, the district court granted the plaintiffs' motion for declaratory judgment and denied the defendants' cross-motion. In addition to entering a declaratory judgment in favor of the plaintiffs, the district court ordered the defendants to file an education plan to provide Rikers Island inmates with the educational services to which they were entitled by state and federal law. *See Handberry I,* 92 F.Supp.2d at 245. As the court later made clear, it entered the declaratory judgment to remedy both plaintiffs' claims of procedural due process violations and their claims under the IDEA, Rehabilitation Act, ADA, and state law. *See Handberry II,* 219 F.Supp.2d at 531–32.

On May 3, 2000, the City defendants submitted their remedial education plan to the court. *See* Educ. Plan for the Rikers Island Academies, *Handberry v. Thompson,* No. 96 Civ. 6161 (S.D.N.Y. May 3, 2000) ("Education Plan" or "Plan"). The Plan stated that, in accordance with the district court's order, it provided "full and complete educational services and facilities to all eligible Rikers Island inmates," including both general and special educational services. *Id.* at 2. In an order dated June 29, 2000, the court adopted the Plan. *Handberry v. Thompson,* No. 96 Civ. 6161 (S.D.N.Y. June 29, 2000) (order adopting Plan). The court did so "only reluctantly," "noting that the Plan would 'not meet all the needs of incarcerated youth inmates' and that it was 'deficient in many respects.'" *Handberry II,* 219 F.Supp.2d at 530 (quoting Order of June 29, 2000, ¶ 2). The court also appointed Dr. Sheri Meisel to monitor the defendants' efforts to implement the Plan and directed Dr. Meisel to submit a report containing her findings after one year.

In her final report submitted December 14, 2001, Dr. Meisel concluded that the Plan had "not been a sufficient framework to guide and sustain compliance with general and special education requirements." Final Report of the Court Monitor in *Handberry v. Thompson* Regarding the Implementation of the Education Plan for the Rikers Island Academies, at 1, *Handberry v. Thompson,* No. 96 Civ. 6161 (S.D.N.Y. Dec.5, 2001) (the "Final Report" or "Report"). The Report continued: "[A] substantial number of school-age individuals confined at Rikers Island consistently received no educational services or substandard services." *Id.* Dr. Meisel "identif[ied] specific deficiencies concerning access to educational services including ineffective notification and recruitment procedures, conflicting school and jail schedules, and lack of correctional officers for escort and security." *Id.* Dr. Meisel also noted that "[s]pecial education and

related services are not provided to all eligible students, and the delivery of special education is compromised by inadequate systems for screening and for individualized education programs." *Id.*

After receiving the plaintiffs' and the defendants' responses to the Final Report and conducting a hearing, the district court issued an order adopting amendments to the Education Plan based on the Report. *Handberry v. Thompson*, 219 F.Supp.2d 525 (S.D.N.Y. Aug.28, 2002) (order amending the City defendants' Education Plan) ("August 28, 2002, Order"). The court ordered, *inter alia*, that the defendants implement procedures to notify inmates of the education services available, take steps to provide general education services to all entitled inmates, provide escorts to enable inmates to attend class, comply with the terms of the IDEA in providing special education services, and provide "cell study" to students in segregated housing. In an opinion issued the same day, the court set forth the reasons for the order. It observed that in ordering the injunctive relief, it relied solely on those factual findings that were uncontested. *Handberry II*, 219 F.Supp.2d at 532.

The City defendants appealed. On November 27, 2002, we vacated the district court's order and directed it to consider whether exhaustion of administrative remedies was required under *Porter v. Nussle*, *supra*, which the Supreme Court had decided subsequent to the district court's decision. *See Handberry v. Thompson*, Nos. 02–0251, 02–0279 (2d Cir. Nov. 27, 2002) (order). The district court, after receiving submissions from the parties and conducting a hearing, concluded that no further exhaustion of administrative remedies was required. The court thereupon

reinstated in full the injunction it had ordered on August 28, 2002, amending the City's Education Plan. The City defendants now appeal.[1]

## DISCUSSION

### I. Exhaustion Requirements

On appeal, the City defendants again argue that the plaintiffs failed to exhaust all available administrative remedies, and contend that the district court should therefore have dismissed the action instead of granting the declaratory judgment to the plaintiffs and ordering prospective relief.

### A. *Exhaustion under the PLRA*

 The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). In *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Supreme Court held that the PLRA's exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences," *id.* at 520, 122 S.Ct. 983, irrespective of whether those conditions are general to all prisoners or affect only one prisoner in particular, *see id.* at 532, 122 S.Ct. 983. Previously, in *Booth v. Churner*, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), the Supreme Court noted that the PLRA required exhaustion if available administrative process had the ability to provide

---

1. State defendant Mills filed a notice of appeal, but later withdrew that notice by stipulation and order. [Docket # 156].

"some relief for the *action* complained of" (emphasis added), even if grievance procedures could not provide the relief sought, *id.* at 738–39, 121 S.Ct. 1819. If no administrative remedies are available, however, then the PLRA does not require exhaustion. *Id.* at 736 n. 4, 121 S.Ct. 1819 ("Without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust."); *see also Mojias v. Johnson*, 351 F.3d 606, 609 (2d Cir.2003) ("[The PLRA] clearly does not require a prisoner to exhaust administrative remedies that do not address the subject matter of his complaint." (internal quotation marks and citation omitted)).

■ Although the PLRA establishes a mandatory exhaustion requirement, it does not create a jurisdictional predicate to our ability to hear the appeal. *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir.2003). Therefore, "[t]he failure to exhaust available administrative remedies is an affirmative defense ... [that] is waiveable." *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir.2004); *accord Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir.2004).

In rejecting the defendants' argument that exhaustion was required, the district court relied on two alternative grounds: that administrative remedies were not "available" and that, in any event, the defendants had waived the affirmative defense of non-exhaustion. With respect to the PLRA's exhaustion requirements, we agree with the district court as to the second ground, and therefore need not and do not address the first.

As noted, in 1996 the City defendants opposed State defendant Mills's motion to dismiss the complaint based on the plaintiffs' alleged failure to exhaust administrative remedies. The City defendants argued that although the PLRA exhaustion requirement "may, ultimately, be decisive," "plaintiffs raise issues that, at this time, appear to be outside the jurisdiction of the Department of Correction." City Defs.' Mem. of Law in Opp. to State Def.'s Mot. to Dismiss at 3, *Handberry v. Thompson*, No. 96 Civ. 6161 (S.D.N.Y. Nov.12, 1996). The City defendants argued to the district court that it should dismiss the motion without prejudice pending discovery which, they contended, would reveal whether "any alleged problems with the delivery of educational services to incarcerated persons in the custody of the Department of Correction are solely attributable to the Department of Correction, [in which case] the matter would be grievable." *Id.* On May 28, 1997, the district court denied Mills's motion to dismiss.

Some two years later, in November 1999, the City defendants cross-moved for summary judgment on the ground that the plaintiffs had failed to exhaust administrative remedies. In their arguments to the district court, they asserted that prison grievance procedures were available based on a Department of Corrections "Directive" that was issued in 1985. *See* City Defs.' Summary Judgment Br. at 11, *Handberry v. Thompson*, No. 96 CV 6161 (S.D.N.Y. Dec.22, 1999). This document, written and issued by the DOC, was available to the City Defendants before any discovery took place. And the district court noted that the director of DOC's Inmate Grievance Program "concluded that the inmates could have filed an inmate grievance concerning access to school" based upon his "review[ of] paragraphs 12–22 of the complaint." *Handberry v. Thompson*, No. 96 CV 6161, 2003 WL 194205, at *4; 2003 U.S. Dist. Lexis 1220, at *10 (S.D.N.Y. Jan. 27, 2003).

■ By opposing Mills's motion on the grounds that there were no relevant available administrative proceedings, the City

defendants waived or conceded the inapplicability of the non-exhaustion defense with respect to prison grievance procedures that were apparent without discovery. The grounds upon which the City defendants asserted a non-exhaustion defense in 1999 were based on information that was available to them prior to any discovery taking place. By asserting in 1996 that there were no available prison grievance procedures based on the same information, the City defendants either waived any such claim or conceded that it was not available to the plaintiffs.

This is not a purely technical matter. Had the City defendants asserted in 1996 that administrative proceedings were available, the plaintiffs might have sought to exhaust any such proceedings before timely returning to federal court. The plaintiffs were entitled to rely, instead, on the City defendants' assertion that, barring the emergence of new information during discovery, the plaintiffs had no administrative process available to exhaust. The City defendants were not entitled to concede at the beginning of the litigation that prison grievance procedures were not available only to assert the contrary three years later based on information available to them from the outset.

We therefore conclude that the City defendants waived or conceded on the exhaustion arguments that they make to us now.[2]

### B. *Exhaustion under the IDEA*

█ The City defendants also assert that the plaintiffs should have exhausted administrative remedies with respect to their federal claims pursuant to the IDEA, the ADA, and section 504 of the Rehabilitation Act. "It is well settled that the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court ....." *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 112 (2d Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1727, 161 L.Ed.2d 616 (2005). "The [IDEA administrative review] process includes review by an impartial due process hearing officer and an appeal from that hearing." *Id.* "The [IDEA's] exhaustion requirement also applies where plaintiffs seek relief under other federal statutes when relief is also available under the IDEA." *Id.; see also* 20 U.S.C. § 1415(*l* ).

We have not yet ruled on whether the IDEA's exhaustion requirements are subject to waiver. In *Polera v. Board of Education*, 288 F.3d 478 (2d Cir.2002), the appellant admitted that she had failed to exhaust available IDEA administrative remedies. *Id.* at 481. We noted our "recogni[tion] that the IDEA's exhaustion requirement does not apply in situations in which exhaustion would be futile because administrative procedures do not provide adequate remedies." *Id.* at 488 (internal quotation marks and citation omitted). However, we concluded that "absent an applicable exception," *id.,* a plaintiff's failure to exhaust IDEA administrative remedies deprived the court of subject matter jurisdiction, *id.* at 483, 488–90.

We need not decide today whether the defendants' waiver of the non-exhaustion defense would constitute such an exception. IDEA exhaustion in the instant case is excused under the futility exception for

---

**2.** The City defendants appear also to assert that they did not waive the non-exhaustion defense with respect to plaintiffs' claims for escort services because "depositions revealed that ... a number of inmates had escort prob- lems getting to school." Appellants' Br. at 40. However, the "escort" claim was apparent from the face of the complaint, *see* Compl. ¶ 84, and this assertion of failure to exhaust, if indeed it is that, is therefore similarly waived.

challenges addressing systemic issues. *See J.S.*, 386 F.3d at 112.

In *J.S.*, the plaintiffs brought a claim in which they alleged that they had been denied a free appropriate public education under the IDEA, the Rehabilitation Act, 42 U.S.C. § 1983, and New York law. *Id.* at 110. We noted that "[t]he complaint was styled as a class action, and the district court described it as containing 'complain[ts] of wrongdoing that [are] inherent in the program itself and not directed at any individual child.'" *Id.* at 110 (second alteration added). "[T]he plaintiffs' problems could not have been remedied by administrative bodies because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process." *Id.* at 114. We therefore concluded that IDEA exhaustion was not required. *Id.* Unlike challenges with respect to the content of a particular student's Individualized Education Plan ("IEP"), *J.S.* addressed a "total failure to prepare and implement [IEPs]." *Id.* at 115.

 Similarly here, the plaintiffs challenge the DOE's and DOC's actions with respect to providing educational services to all entitled inmates at Rikers Island. As we concluded in *J.S.*, individual administrative remedies would be insufficient to address the defendants' failure to provide the service required by the IDEA to all relevant inmates. *See id.* at 112. The purposes of exhaustion—to "allow[ ] for

the exercise of discretion and educational expertise by state and local agencies," *id.* (quoting *Polera*, 288 F.3d at 487)—are unavailing where the alleged issue is the absence of any services whatsoever. *Id.* at 114–15. As to the plaintiffs' claim, then, exhaustion is futile, and administrative remedies are effectively unavailable.[3] We therefore conclude that the plaintiffs' failure to exhaust administrative remedies as required by section 1415(f)—(g), (i) for IDEA claims (and ADA and Rehabilitation Act claims for overlapping relief that would also be available under the IDEA as per section 1415(*l* )) does not bar our subject matter jurisdiction over this suit.

## II. Prospective Relief

### A. Prospective Relief for State–Law Claims

Section 802 of the PLRA, 18 U.S.C. § 3626(a)(1)(A), provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." The City defendants argue that the PLRA thus limits the district court's power to order prospective relief for violations "solely of state law." Appellants' Br. at 52. We agree.

Congress defined the term "civil action with respect to prison conditions" as "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons con-

---

**3.** To the extent the PLRA of its own force requires the exhaustion of IDEA administrative remedies, that exhaustion requirement does not bar the instant suit with respect to plaintiffs' IDEA, ADA, or Rehabilitation Act claims. First, as discussed in the previous section, the City defendants waived any such arguments. Second, even if *Porter*'s or *Booth*'s requirements with respect to PLRA exhaustion applied (or even if the reasoning of *Porter* and *Booth* applied independently to IDEA exhaustion), we conclude that there are no available IDEA administrative remedies and therefore *Porter* and *Booth* would not require exhaustion of such remedies as a prerequisite to bringing suit. *See Porter,* 534 U.S. at 520, 532, 122 S.Ct. 983; *Booth,* 532 U.S. at 736 n. 4, 121 S.Ct. 1819.

fined in prison" except for habeas corpus proceedings. 18 U.S.C. § 3626(g)(2). The instant civil proceeding, having been brought in part (and relief having been granted in part) under the IDEA, the Rehabilitation Act, and the ADA, arises under Federal law, even if some of the claims prosecuted in the course of the proceedings are state-law claims. This action also addresses "the effects of actions by government officials on the lives of persons confined in prison," 18 U.S.C. § 3626(g)(2), because it challenges the adequacy of the defendants' provision of educational services and related ancillary services to inmates. Thus, under the language of section 3626(a)(1), any prospective relief ordered in this case must "extend no further than necessary to correct the violation of the *Federal* right of [these] particular ... plaintiffs." (emphasis added).

■ In 28 U.S.C. § 1367(a), Congress provided federal district courts with so-called supplemental jurisdiction to decide certain state-law claims. It reads:

> Except as provided in [other] subsections [of section 1367] ... or as expressly provided by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

*Id.* The plaintiffs argue that under these provisions, the district court had jurisdiction over any state-law claims related to the federal claims being adjudicated and, therefore, that the court had the power to vindicate fully those state-law rights. For us to read 18 U.S.C. § 3626(a)(1)(A) to prohibit prospective relief on such state-law claims, they contend, would be for us to read it to impliedly repeal 28 U.S.C. § 1367(a) in part. Such "implied repeals," they point out, are not favored by courts, which assume that Congress generally does not intend to enact laws in conflict with its own earlier statutes without saying so. "[A]bsent a clearly established congressional intention, repeals by implication are not favored. An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." *Lockhart v. United States,* —— U.S. ——, 126 S.Ct. 699, 704, 163 L.Ed.2d 557 (2005) (internal quotation marks and citation omitted).

Here, though, Congress explicitly contemplated that other statutes would limit the supplemental jurisdiction granted in section 1367, which provides that such jurisdiction may be limited "as expressly provided by Federal statute." By its terms, 18 U.S.C. § 3626(a)(1)(A) appears to be such a "Federal statute."

True, on occasion, when Congress has limited section 1367, it has referred explicitly to jurisdiction. *See, e.g.,* 42 U.S.C. § 13981(e)(4) (providing that section 1367 shall not "be construed, by reason of a claim arising under such subsection, to confer on the courts of the United States jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property or child custody decree"). It hardly follows, however, that Congress *must* make specific reference to section 1367 in order to limit its reach. Indeed, Congress likely did not do so here because section 3626(a) limits not jurisdiction, but rather the types of remedies available once jurisdiction has been properly invoked.

The only provisions of section 3626 that refer explicitly to state law claims further

support this reading of the statute. Section 18 U.S.C. § 3626(d) reads, "State law remedies.—The limitations on remedies in this section shall not apply to relief entered by a State court based solely upon claims arising under State law." This provision appears to clarify the scope of section 3626(a)'s remedial limitations. Since section 3626(a)(1) states that "in *any* civil action" (emphasis added) related to prison conditions prospective relief shall be narrowly drawn, section 3626(a) would appear to operate to limit the remedial powers of both federal *and* State courts in such cases. This limitation includes two elements: First, it limits the extent of such relief to that which is "no further than necessary to correct the violation;" second, it narrows the permissible grounds for prospective relief by requiring that it be issued only to remedy violations of "the Federal right" in the case. Therefore, if a State court were hearing a civil action involving both state and federal claims, section 3626(a) would not only require that any prospective relief for a federal claim "extend no further than necessary to correct" its violation, but would also seem to prevent that court from ordering any prospective relief at all for violations of the state law claims. But such a result would clearly infringe upon a state's traditional power to grant its courts a full range of remedial powers. Thus, subsection (d) was included to foreclose this result.

Subsection (d) explicitly carves out an exception for State courts from the requirement that prospective relief go "no further than necessary to correct the violation" and remedy only "the Federal right" in the case, so the blanket restriction on prospective relief must apply to all civil actions related to prison conditions in *federal* courts. But since, under this view, the restriction both limits the extent of the relief and requires that it remedy a federal right, we think section 3626 clearly prohibits a federal court from issuing preventive relief based entirely upon state-law claims.[4]

■ It follows from the foregoing analysis that the district court was not permitted to order prospective relief to remedy an asserted violation of state law only. We thus agree with the City defendants that the district court erred in ordering such relief, and we vacate those portions of the injunction—paragraphs three through five, seven, nine through eighteen, thirty-nine through forty-three, and forty-five— that appear to be based solely on asserted violations of state law.

### B. Prospective Relief for Federal Law Claims

With respect to remedies of federal law violations, the PLRA provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1); *see also Benjamin v. Fraser*, 343 F.3d 35, 56 (2d Cir.2003) ("[T]he PLRA requires the court to make particular findings . . . when it identifies [federal] violations.").

"Although the PLRA's requirement that relief be 'narrowly drawn' and 'necessary' to correct the violation might at first

---

4. The only other provision in section 3626 that explicitly mentions state law is § 3626(c)(2)(B), which provides that "[n]othing in this section shall preclude any party claiming that a private settlement agreement has been breached from seeking in State court any remedy available under State law." Here, too, the statute only protects state law remedies in *state courts* from the PLRA's remedial restrictions.

glance seem to equate permissible remedies with [legal] minimums, a remedy may require more than the bare minimum [federal law] would permit and yet still be necessary and narrowly drawn to correct the violation." *Benjamin,* 343 F.3d at 54. A remedy may be deemed to be properly drawn if it provides a practicable "means of effectuati[on]" even if such relief is over-inclusive. *Id.* (concluding that comprehensive window repair program at prison was necessary to remedy due process violation and narrowly drawn "[g]iven the impracticability of the court examining each window").

The district court acknowledged that it was required to make "need-narrowness-intrusiveness" findings under the PLRA. *See Handberry II,* 219 F.Supp.2d at 533. It noted that "[m]uch of the relief requested by plaintiffs falls beyond the scope of 'least intrusive' and 'narrowly drawn.'" *Id.* The court decided, however, that "the City defendants, by their own admission or by failing to dispute the findings of the monitor, remain non-compliant with applicable state and federal law after years of litigation" and that the court was "therefore compelled to order compliance." *Id.* The court concluded that "[t]he order filed herewith ... is crafted in a way that is narrowly drawn and extends no further than necessary to achieve compliance while keeping in mind public safety and the operation of the criminal justice system." *Id.* The court further made specific findings regarding the defendants' provision of educational services. The City defendants argue that the court nonetheless did not satisfy the PLRA's "need-narrowness-intrusiveness" requirements.

*1. Applicability of Injunction to All DOC Inmates.* The City defendants contend that paragraph six of the injunction, which "purports to apply [its terms] to all DOC facilities" is "overbroad" because

"[t]he plaintiff class ... consists only of inmates who, *inter alia,* are incarcerated at DOC facilities on Rikers Island." Appellants' Br. at 55 (internal quotation marks omitted) (citing *Handberry II,* 219 F.Supp.2d at 530).

While the district court did describe the plaintiff class as consisting of inmates housed on Rikers Island, *see Handberry II,* 219 F.Supp.2d at 530, the plaintiff class "is defined as all inmates under the age of twenty-one in the custody of the New York City Department of Correction who have not yet received their high school diploma or its equivalent." *Handberry v. Thompson,* No. 96 Civ. 6161 (S.D.N.Y. Nov.20, 1996) (stipulation and order for provisional class certification and notice to the class). We are aware that the defendants' Education Plan and the special monitor's final report address solely the provision of services at Rikers Island jails. We think it is clear that this is because, as evidence submitted by the City defendants seems to establish, DOE only provides educational services at Rikers Island jails; inmates at DOC's remaining four jails, the "Borough Houses" must transfer to a Rikers Island jail to receive such services. Am. Decl. of Esteban Colon ¶¶ 10–11, *Handberry,* No. 96 Civ. 6161 (S.D.N.Y. Dec.21, 1999). Thus, the district court did not err in ordering relief on the basis of the facts before it for the entire class. We therefore reject the City defendants' contention that paragraph six is impermissibly broad.

*2. IDEA Screening Provisions.* The "Child Find" provisions of the IDEA establish that the state must have "policies and procedures to ensure that" "[a]ll children with disabilities ... in need of special education and related services[ ] are identified, located, and evaluated and [that] a practical method [must be] developed and implemented to determine which children

with disabilities are currently receiving needed special education and related services." 20 U.S.C. § 1412(a)(3)(A). In its opinion, the district court declared that although the Education Plan "listed five different mechanisms for identifying inmates eligible to receive special education and/or related services[,] ... the City defendants have failed to consistently rely on these mechanisms." *Handberry II*, 219 F.Supp.2d at 540. Paragraph nineteen of the injunction thus requires the defendants to "comply with the requirements of 20 U.S.C. § 1421(a)(3)(A), 34 C.F.R. § 300.125, and 34 C.F.R. § 300.300(a)(2), and [to] implement screening procedures to locate, identify, and evaluate all eligible inmates with disabilities." August 28, 2002, Order ¶ 19.

We do not see how this prospective relief, which tracks the statutory language of the IDEA's Child Find requirement precisely, can be viewed as unnecessary, overbroad or over-intrusive. The City defendants nonetheless argue that the district court's order was improper because the court "found no inmates with a disability who should have been referred for evaluation, but were not." Appellants' Br. at 55. But we fail to see how this contention relates to the question of whether the City defendants have failed to meet their affirmative obligation to screen eligible inmates for disabilities. Indeed, the IDEA's apparent purpose in requiring screening is to find eligible inmates who might otherwise not be identified—without an effective screening mechanism in place, it is impossible for the City defendants, or anyone else, to identify inmates who should be referred for evaluation. We therefore reject their argument with respect to paragraph nineteen of the injunction.

*3. Initial Meeting with Special Education Team.* In paragraphs twenty-one and twenty-two of the injunction, the district court ordered that inmates identified as in need of special education services meet with a "school based support team or pupil personnel team" within five days. August 28, 2002, Order ¶¶ 21–22. The court further ordered that "[t]he purpose of this meeting shall be to determine if identification and assessment of that inmate as in need of special educational services is appropriate. If so, then an initial evaluation for special education shall be performed pursuant to the procedures set forth in 20 U.S.C. §§ 1414–1415 and their implementing regulations." *Id.* ¶ 22.

The IDEA requires that the state ensure that "[c]hildren with disabilities are evaluated in accordance with subsections (a) through (c) of section 1414 of this title." 20 U.S.C. § 1412(a)(7). Thus, the educational agency must "conduct a full and individual initial evaluation ... before the initial provision of special education and related services" and "such initial evaluation shall consist of procedures ... to determine the educational needs of such child." 20 U.S.C. § 1414(a)(1). The evaluation thus mandated by the IDEA constitutes a significant step toward developing the IDEA's primary device for delivering special education services: the IEP. *See* 20 U.S.C. § 1412(a)(4); *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir.2005). The IEP, developed by educators in conjunction with the child's parents, sets forth a specific and particularized plan for each child's development. It must contain, *inter alia*, a statement of the child's goals and steps to be taken to transition the child to the least restrictive environment. *See id.* §§ 1412(a)(4), 1436(d). Because of the timing constraints associated with the transient nature of the Rikers Island population, the defendants use a Temporary Education Plan ("TEP") for students with disabilities that "serve[s]

as the student's IEP until release from Rikers Island and entrance into a school program where a new, more permanent IEP is required." *Rikers Island Standard Operating Procedures* 4 (July 1997) ("Rikers Island SOP Manual").[5] A TEP appears to be similar in most respects to an IEP, although it is developed based on a single diagnostic academic placement test rather than, as with the IEP, using multiple assessment tools. *See* August 28, 2002, Order ¶¶ 17–18; 20 U.S.C. § 1414(b)(2).

The City defendants challenge the terms of injunction paragraphs twenty-one and twenty-two, contending that federal law does not "require[ ] that a three-person team of education professionals meet[ ] with every inmate who needs or may need special education, within five days of the inmate's special education identification or referral."[6] Appellants' Br. at 56.

■■■■ We disagree. Coming as it does after a finding that the City defendants had failed to fulfill their screening and evaluation requirements and had not lived up to the terms of the Education plan, *see Handberry II*, 219 F.Supp.2d at 540, the injunction's requirement that the City defendants comply with the terms of the IDEA meets the "need-narrowness-intrusiveness" requirements of the PLRA; it is not unnecessary, overbroad, or over-intrusive for the district court to require the City defendants to comply with the terms of the Act based upon a finding that the City defendants are not presently doing so. And the district court's requirement that

students meet with a student based support team ("SBST") or a pupil personnel team is based on the Rikers Island SOP Manual, which sets forth that the SBST's major role is to develop educational plans for students with disabilities. That statement does not appear to us to be merely hortatory, aspirational or rhetorical. We therefore do not see how the court's order that the defendants comply with the requirements of the IDEA by using procedures based on requirements of their own SOP manual is, at least under the circumstances presented, either overbroad or over-intrusive. *Cf. Benjamin*, 343 F.3d at 54 (finding prospective relief to satisfy PLRA requirements appropriate where it was based on "DOC's own policy directive.").

The City defendants also contend that the five-business-day deadline within which the City defendants are to provide students who have been identified as having disabilities with an initial meeting in order to assess whether a TEP is necessary is "overly burdensome." Appellants' Br. at 56. The Rikers Island SOP Manual states that TEPs must be developed for "all students with disabilities attending a Rikers Island school," Rikers Island SOP Manual at 2, and that "every effort will be made" to provide students with TEPs prior to their release, *id.* at 4. In their brief to us, the City defendants point out that the Rikers Island population is "primarily transient" and suggest that most students leave Rikers Island within ten to thirteen

---

5. We cite the Rikers Island SOP Manual not, of course, because it or other state sponsored rules are enforceable in this action, but for the limited purpose of supporting a conclusion that the remedies afforded by the district court were not 'overly burdensome.'

6. We note that the district court's injunction makes no mention of the number of members that comprise a school based support team or

pupil personnel team, but instead refers the defendants to such teams, as they have established through the City defendants' own procedures. The City defendants' attempt to represent the district court's order as overly intrusive, by pointing to the number of people on such team—which apparently derives from the City defendants' own choice in that regard—fails.

business days of their incarceration. Appellants' Br. at 7. We do not think that, under these circumstances, the district court's requirement is in this regard unnecessary, overbroad, or over-intrusive.

■ *4. Provision of TEPs.* In paragraph twenty-six of the injunction, the district court ordered the DOE to develop TEPs for students who do not have current IEPs within thirty school days of enrollment. In deciding to order this relief, the court concluded that the City defendants had failed to develop and implement TEPs and had thereby deprived students of the special education services to which they are legally entitled. *Handberry,* 219 F.Supp.2d at 541–42. The City defendants do not contest this conclusion. They argue instead that the thirty-school-day deadline for TEP implementation is "excessively burdensome," Appellants' Br. at 57, because existing Rikers Island procedures establish a twenty-school-day waiting period before the SBST team must meet with the student to begin developing a TEP. As we have noted, however, those procedures also state that "every effort will be made to ensure that students have a TEP prior to their release from Rikers Island." Rikers Island SOP Manual at 4. And the City defendants report that "most entitled inmates are incarcerated for less than 30 calendar days," Appellants' Br. at 57 n. 24, and that the majority are released after ten business days, *id.* at 7. These facts suggest that, by the City defendants' own procedures, students should be provided with a TEP within less than thirty days. In light of the fact that the deadline for TEP development is more generous than that which would logically follow from the City defendants' own procedures, we do not think that the thirty-school-day deadline for TEP implementation fails the

PLRA's "need-narrowness-intrusiveness" test. *See Benjamin,* 343 F.3d at 55.

■ The defendants also assert that the last two sentences of paragraph twenty-six of the August 28, 2002, Order contravene the IDEA by "eviscer[ating] the parental informed consent requirements." Appellants' Br. at 57. Those sentences provide: "The TEP shall be created by an IEP/TEP team in accordance with 20 U.S.C. § 1414(d)(1)(B) and 34 C.F.R. § 300.344. If for any reason a required member of the IEP/TEP team fails to participate (either in person or telephonically), the reason(s) for his or her nonparticipation shall be documented in the TEP itself." August 28, 2002, Order ¶ 26. Under 20 U.S.C. § 1414(d)(1)(B), the IEP team is defined to include a disabled child's parents, and under 34 C.F.R. § 300.344, the DOE "shall ensure" that the IEP team includes the child's parents. However, "[a] meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend. In this case the public agency must have a record of its attempts to arrange a mutually agreed on time and place . . . ." 34 C.F.R. § 300.345(d). The August 28, 2002, Order, in requiring that the City defendants comply with applicable law, and in mandating that the reasons for absence of a required member be noted "in the TEP itself," August 28, 2002, Order ¶ 26, reinforces rather than "eviscerate[s]" the requirements of the IDEA.

■ The City defendants further contend that paragraph twenty-seven of the injunction, which requires that a TEP shall, *inter alia,* "include measurable annual and short term academic and social/behavioral objectives as determined to be necessary for each student to improve performance," August 28, 2002, Order ¶ 27, is overbroad because "all items, except annual goals and dates for initiation and dura-

tion of services, are already listed on a TEP" and "annual goals are meaningless in a jail setting." Appellants' Br. at 58. On this issue, we agree with the defendants. Although the IDEA requires that the IEP includes "a statement of measurable annual goals, including academic and functional goals," 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa)-(bb), it would be absurd to apply annual goals to students who only reside in the jail for a matter of weeks. *Cf. Yerdon v. Henry,* 91 F.3d 370, 376 (2d Cir.1996) ("Where an examination of the statute as a whole demonstrates that a party's interpretation would lead to absurd or futile results ... plainly at variance with the policy of the legislation as a whole, that interpretation should be rejected.") (internal citation and quotation omitted); *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) ("[T]he cardinal rule [is] that a statute is to be read as a whole ... since the meaning of statutory language, plain or not, depends on context.") (internal citation omitted). Thus, this provision of the PLRA does not apply to the plaintiffs in this case, and the section of paragraph 27 requiring adherence to annual goals is hereby vacated.

*5. Continuum of Services.* In their Reply Brief, the City defendants assert for the first time that paragraphs thirty-two and thirty-four of the district court's injunction are overbroad. The City defendants contend that these provisions "are not based on any violation of an inmate's federal rights." Appellants' Reply Br. at 25. Paragraph thirty-two requires that "[a] range of special educations services shall be available ... to meet the needs of disabled students, including but not limited to, general classroom instruction, with supplementary aids and services, skills support classes, resource rooms; and self-contained classes for students with intensive needs." August 28, 2002, Order ¶ 32.

The district court concluded that the City defendants' "amorphous one-size-fits-all 'skills class' either taught by a special education teacher or by a subject area teacher in consultation with a special education teacher ... is less than what the City defendants are required to provide under the terms of the original Education Plan and falls far short of the sort of individualized services required by the IDEA." *Handberry,* 219 F.Supp.2d at 543.

█ Under the IDEA, the City defendants must provide "[a] free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); *see also id.* § 1400(d)(1)(A) (stating that such free appropriate public education must "emphasize[ ] special education and related services designed to meet their unique needs"). In so doing, the City defendants must "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services," including "instruction in regular classes [and] special classes," and the "provision for supplementary services [ ]such as resource room." 34 C.F.R. § 300.551; *see also id.* §§ 300.5, 300.301. The City defendants do not dispute that they did not provide the required continuum of services to students with disabilities. We are unpersuaded by their argument that the district court erred in ordering them to do so.

Similarly, paragraph thirty-four requires that the DOC furnish space to enable the DOE to provide counseling services. The IDEA requires that the DOE provide related services, including counseling. 34 C.F.R. § 300.24(a). The district court found that the space provided for such counseling was inadequate. The City defendants responded that they would make space in the George R. Vierno Center available for counseling. The court incor-

porated this response into the order. We do not see how this portion of the order can be deemed unnecessary, overbroad, or over-inclusive.

6. *Responsibility for Costs of Special Monitor.* The City defendants argue that paragraph forty-seven "should be vacated to the extent that it requires City defendants and the State to pay for the special monitor" on the ground that "these expenses should be borne by the judiciary" under 18 U.S.C. § 3626. Appellants' Br. at 59. Section 3626(f)(4) establishes that, if the court appoints a "special master," his or her compensation must be "paid with funds appropriated to the Judiciary." *Id.* § 3626(f)(4).

■■■ This argument is foreclosed by our decision in *Benjamin v. Fraser, supra.* There we concluded that the Office of Compliance Consultants ("OCC"), which had been appointed to monitor compliance with consent decrees concerning prison conditions, was not a special master within the meaning of the PLRA. *Benjamin,* 343 F.3d at 44–47. We reasoned that the OCC did not have "the ability to convene and to regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt." *Id.* at 45. We noted that "[t]he master's responsibilities typically culminate in a report. If the report includes findings of fact, they are binding in non-jury actions unless clearly erroneous." *Id.* We decided that while the OCC's reports aided the court in assessing compliance efforts, the OCC did not exercise "quasi-judicial power" and was therefore not a special master. *Id.* at 47. The PLRA's requirements regarding the compensation of special masters therefore did not apply to OCC. *Id.*

Here, the district court appointed Dr. Meisel to "assess the City defendants' compliance with this order and provide the

court and counsel with semi-annual reports specifically identifying any areas of non-compliance." August 28, 2002, Order ¶ 46. The court determined that "[t]he reports may also contain recommendations for further modifications to the Education Plan as amended by this Order" and that "[t]he monitor in her report may also recommend specific changes in BOE and DOC policies and procedures." *Id.* In using the special monitor's first such report, the district court used it as an aid in assessing the City defendants' compliance with the terms of the Education Plan and the requirements of the IDEA. *See Handberry,* 219 F.Supp.2d at 530. The court adopted specific factual findings that it found to be uncontroverted by the defendants. *Id.* at 532. As is clear from this use of the monitor's previous report, and from the terms of the district court's order reappointing Dr. Meisel as special monitor, Dr. Meisel has not been given a mandate to exercise quasi-judicial powers, such as finding facts that would be binding on the court absent clear error. *See Benjamin,* 343 F.3d at 45. We conclude that Dr. Meisel is thus not a "special master" within the meaning of the PLRA. The City defendants' argument that paragraph forty-seven is invalid thus fails.

### III. Due Process

The district court granted a declaratory judgment to the plaintiffs on the overlapping grounds that the DOE's and DOC's failure to provide the educational benefits to which the plaintiffs are entitled violated state and federal law and constituted a deprivation of property without due process. *See Handberry;* 219 F.Supp.2d at 531–32; *Handberry,* 92 F.Supp.2d at 248–49. The plaintiffs argue that they have a property interest in a public education and, second, that the de-

fendants have deprived them of their property interest without due process of law.

We note at the outset that the relief sought by the plaintiffs—that the defendants provide them with substantive educational services—hardly seems well suited to remedy a *procedural* violation. But because we conclude that the plaintiffs do not possess a property interest in any particular educational conditions, we need not reach the issue of whether the relief sought would be an appropriate remedy for the deprivation of such a property interest.

The Fourteenth Amendment does not protect a public education as a substantive fundamental right. *See San Antonio Indep., Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution."); *Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("Public education is not a 'right' granted to individuals by the Constitution."). The plaintiffs nevertheless contend that they have a property interest in a public education, that such a property interest continues during their incarceration, and that the defendants' failure to provide them with adequate educational services deprives them of that interest without due process of law.

In order for a benefit to qualify as a property interest, the person claiming it must have a "legitimate claim of entitlement" to the benefit, rather than a mere "unilateral expectation of it." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In determining whether a party has a legitimate claim to a benefit, "we look to the statutes and regulations governing the distribution of benefits." *Kapps v. Wing,* 404 F.3d 105, 113 (2d Cir.2005). We will find there to be a property interest if the relevant statutes and regulations "meaningfully channel[ ] official discretion by mandating a defined administrative outcome." *Sealed v. Sealed,* 332 F.3d 51, 56 (2d Cir.2003).[7]

The plaintiffs rely primarily on two provisions of state law in arguing that they have a property interest in a public education. First, New York's Constitution directs that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." N.Y. Const. Art. 11, § 1. It does not appear that this provision alone gives rise to a "legitimate claim of entitlement" by "children of [the] state" because on its face it requires only that the legislature maintain a public school system. But the plaintiffs also rely on New York's education laws, which provide in part that "[a] person over five and under twenty-one years of age who has not received a high school diploma is entitled to attend the public schools maintained in the district in which such person resides without the payment of tuition." N.Y. Educ. L. § 3202(1).

---

**7.** It is true that the Supreme Court has cautioned against relying on the type of language used in statutes and regulations in determining whether or not a protected interest has been created. *See Sandin v. Connor,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that the tendency of courts, in the wake of *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), to focus on the particular language used in prison regulations "creates disincentives for states to codify prison management procedures in the interest of uniform treatment."). However, as the plaintiffs point out, *Sandin* was concerned with the proper definition of *liberty* interests, not property interests. Perhaps for that reason, this Circuit has continued to focus on the type of language used in a statute that is alleged by a party to have created a property interest. *See, e.g., Kapps,* 404 F.3d at 113–14, and *Sealed,* 332 F.3d at 56.

The statutory provision does appear to create a property interest in education protected by the Fourteenth Amendment. *See Mitchell C. v. Bd. of Educ.*, 67 A.D.2d 284, 288, 414 N.Y.S.2d 923, 926 (2d Dep't 1979) ("[W]here a State or subdivision thereof undertakes to provide a free education to all students, it must recognize an individual student's legitimate entitlement to a public education as a property interest protected by the due process clause . . . ."); *see also Goss v. Lopez*, 419 U.S. 565, 573, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding that "on the basis of [Ohio] law, appellees plainly had legitimate claims of entitlement to a public education").

It does not follow, however, that such a property interest continues unaffected during incarceration, as the plaintiffs contend. Indeed, a later section of the statute specifically covers educational services during incarceration. Section 3202(7) directs that:

> A person under twenty-one years of age who has not received a high school diploma and who is incarcerated in a correctional facility maintained by a county or by the city of New York or in a youth shelter is eligible for educational services pursuant to this subdivision and in accordance with the regulations of the commissioner.

N.Y. Educ. L. § 3202(7). This provision makes clear that the statute treats youths who are incarcerated differently than those who are not. Whereas section 3202(1) directs that any person under twenty-one without a high school diploma "is *entitled* to attend the public schools" (emphasis added) in their district without payment, section 3202(7) provides that such persons who are incarcerated are "*eligible* for educational services . . . in accordance with the regulations of the commissioner" (emphasis added). Section 3202(7) thus does not appear to give rise to the same type of "legitimate expectation" of an educational benefit that section 3202(1) does.

No New York court has, to the best of our knowledge, yet addressed the question of whether section 3202(7) creates a property interest for the purpose of the due process clause of the Fourteenth Amendment. Many courts, however, have interpreted a similar statute that governs educational services for adults in prisons. N.Y. Correction Law § 136 provides in relevant part:

> The objective of correctional education in its broadest sense should be the socialization of the inmates . . . . To this end each inmate shall be given a program of education which, on the basis of available data, seems most likely to further the process of socialization.

*Id.*

Courts analyzing this provision have been reluctant to find that inmates have a property interest in such "socialization" programs. In *Clarkson v. Coughlin*, 898 F.Supp. 1019 (S.D.N.Y.1995), on which the plaintiffs rely, the district court granted declaratory relief for hearing-impaired inmates who asserted that the state had failed to offer them reasonable accommodations as required by the Americans with Disabilities Act. But the court rejected the plaintiffs' argument that N.Y. Correction Law § 136 created a property interest in educational programs. In so holding, the court recognized that "some property interest is created" by section 136, but it noted that "given the discretionary function of corrections officials which is inescapable in the language of the statute, only the provision of *no education at all* or education that was *wholly unsuited* to the goals of a particular inmate's socialization and rehabilitation trigger those protections." *Id.* at 1041 (emphasis added).

Other courts, both before and after *Clarkson,* have uniformly rejected plaintiffs' arguments that section 136 gives rise to protected property interests. *See Wright v. Coughlin,* 31 F.Supp.2d 301, 311 (W.D.N.Y.1998); ("Prison officials need not provide an educational program tailored to the specific needs and circumstances of the inmate."); *Giano v. Cuomo,* 1998 WL 760262, 1998 U.S. Dist. LEXIS 17215 (N.D.N.Y.1998) (holding that a Uruguayan plaintiff did not have a protected interest in an educational program geared towards his native culture and language); *Allah v. Coughlin,* 190 A.D.2d 233, 237, 599 N.Y.S.2d 651, 654 (1st Dept.1993) (holding that section 136 "does not entitle petitioners to any specific education or the right to take a high school equivalency exam free of charge"); *Jones v. Grunewarld,* 644 F.Supp. 256, 259 (S.D.N.Y.1986) (holding that section 136 does not provide an inmate a protected property interest in a scholarship); *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983) (holding that section 136 does not provide inmates a protected property interest in both a full-time education and a full-time job).

If only a complete lack of education or one "wholly unsuited" to the statutory goals constitutes a deprivation of a property interest under section 136, there are several reasons to conclude that the same is required to constitute a deprivation of a property interest for the purposes of section 3202(7).

First, the language of section 136 is more categorical than that of section 3202(7), suggesting that the latter is, if anything, *less* likely to give rise to a property right than is section 136. Whereas section 3202(7) provides only that certain persons would be "eligible" for education, section 136 directs that inmates *"shall be given* a program of education." (emphasis added). It would be odd if the former

provision created a "legitimate claim to entitlement," while the latter did not.

Second, the judicial interpretations of section 136 cited above are in accord with the Supreme Court's and this Circuit's interpretations of federal prison programs. *See, e.g., Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976) ("Congress has given federal prison officials full discretion to control these conditions of confinement . . . and petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process.") (citation omitted); *Lee v. Governor of State of N.Y.,* 87 F.3d 55, 58 (2d Cir. 1996) (deciding that a rule rendering inmates ineligible for a temporary release program did not give rise to an interest protected by the Fourteenth Amendment).

Finally, the extensive regulations promulgated pursuant to section 136 and section 3202(7) are similar. *See* 9 N.Y.C.R.R. § 7677 (2005) and 8 N.Y.C.R.R. § 118 (2005). Each set of regulations provides, *inter alia,* minimum hours of instruction, § 7677.4(e) and § 118.4(b), mandatory levels of education (in both cases, high school equivalency), § 7677.4(2) and § 118.4(c)(4)(i), and specialized services for students with learning disabilities, § 7767.4(3) and § 118.2(b). Indeed, the regulations governing adult education under section 136 appear to be, if anything, more demanding than those governing youth under section 3202(7). Section 7766.4(4), for instance, requires that bilingual programs be designed to meet the needs of non-English speakers, while no comparable provision can be found in section 118 for non-English speaking youth. Thus, if section 136 does not give rise to a "legitimate claim of entitlement" to anything more than an education while incarcerated that is not "wholly unsuited" to the legislature's goals, neither, we think, does section 3202(7).

Education was not completely denied to the plaintiffs in the case at bar. They concede that the defendants have provided the minimum number of hours required by the regulations. And indeed, we affirm the district court's judgment insofar as it incorporates paragraph 8 of the injunction, ensuring that the defendants continue to provide the regulatory minimum of fifteen hours per week of instruction. The plaintiffs cannot support any further injunctive relief, however, on the basis of the due process clause of the Fourteenth Amendment.

## IV. Abstention

The City defendants argue that the district court should have abstained from deciding this case under *Railroad Commission of Texas v. Pullman,* 312 U.S. 496, 498–501, 61 S.Ct. 643, 85 L.Ed. 971 (1941). We review for abuse of discretion a district court's decision regarding abstention. *Planned Parenthood v. Steinhaus,* 60 F.3d 122, 126–27 (2d Cir.1995); *Bethphage Lutheran Serv., Inc. v. Weicker,* 965 F.2d 1239, 1244 (2d Cir.1992). *Pullman* abstention may be appropriate where a claim implicates an unresolved or unclear issue of state law. *See Catlin v. Ambach,* 820 F.2d 588, 589 (2d Cir.1987). We do not think that the New York State law at issue here is so unclear that it was an abuse of discretion for the district court to decline to abstain. *See Steinhaus,* 60 F.3d at 126–27. "The regulations at issue are neither ambiguous nor unintelligible, nor are they rendered 'unclear' [even if] no state court has yet construed them." *Id.* at 126. We therefore reject the City defendants' argument that the district court erred in this respect.

## CONCLUSION

For the foregoing reasons, we affirm those portions of the judgement of the district court insofar as it is based on federal law and vacate those portions based purely on state law. Specifically:

We vacate the judgment of the district court insofar as its injunction appears to be based exclusively on state law: ¶¶ 3–5, 7, 9–18, 39–43, 45. We also vacate paragraph 27 on the ground that, although based on federal law, it makes little sense to require the assessment of inmates relative to "annual goals" in this context.

We also affirm the judgment of the district court insofar as it enjoins conduct that appears to be based primarily on federal statutory law: ¶¶ 6, 19, 21, 22, 24, 26, 28, 31–32, 34, 37, 44, 46–7. We also affirm the judgment insofar as it contains paragraph 8 of the injunction on the basis of the due process clause of the Fourteenth Amendment.

It is not entirely clear to us whether the remaining substantive paragraphs of the injunction, ¶¶ 20, 23, 25, 29, 30, 33, 35, 36, 38, are based primarily on state law or federal law. We therefore vacate those portions of the judgment and remand with instructions that the district court determine which, if any, of these parts of the injunction are "necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs," 18 U.S.C. § 3626(a)(1)(A), and limit the injunction thereto.